522 F.2d 990
 36 A.L.R.Fed. 219
 Mrs. Brent Quinton DOWNS for herself as Executrix of the
Estate of Brent Quinton Downs, and as guardian and next
friend of Andrew Arthur Downs and Brent Q. Downs, II,
minors, et al., Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 74-1660.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 8, 1975.
 
 Gilbert S. Merritt, Jr., Thomas Wardlaw Steele, Gullett, Steele, Sanford, Robinson & Merritt, Jack A. Butler, Nashville, Tenn., for plaintiffs-appellants.
 Charles H. Anderson, U. S. Atty., Nashville, Tenn., John G. Laughlin, Chief, Tort Section, Leonard Schaitman, Neil Koslowe, Martha Johnson, Dept. of Justice, Washington, D. C., for defendant-appellee.
 Before PHILLIPS, Chief Circuit Judge, and CELEBREZZE and MILLER, Circuit Judges.
 CELEBREZZE, Circuit Judge:
 
 
 1
 This appeal presents two basic questions concerning the United States' liability for actions of FBI agents resulting in the death of innocent victims of a hijacking. These issues are the applicability of the "discretionary function" exception to the Federal Tort Claims Act[1] and the existence of negligence under Florida law on the facts of this case.
 
 
 2
 This action arose out of the hijacking of a small passenger airplane in Nashville, Tennessee. Inside the aircraft were the hijacker, an associate, the hijacker's estranged wife, a pilot, and a co-pilot. The hijacker ordered the aircraft flown to Freeport, Bahamas, with a refueling stop in Jacksonville, Florida. After the plane landed in Jacksonville, FBI agents refused to allow refueling, despite the pilot's signals that the hijacker was armed and dangerous and that in his opinion the agents' intervention would prove disastrous. The hijacker allowed the co-pilot, and, later, an associate to deplane to bargain for fuel. The FBI agents took them both into custody. Moments later the agents used rifle fire to disable one of the aircraft's engines and attempted, unsuccessfully, to deflate the aircraft's tires. This attack provoked the hijacker to shoot and kill his wife, the pilot, and himself.
 
 
 3
 The survivors of the hijacker's victims sued the United States under the Federal Tort Claims Act, alleging that the chief FBI agent had been negligent in handling the situation and had thereby caused the two victims' deaths. The aircraft's owner sued for damage to the plane. The Government defended, asserting that the "discretionary function" exception to the Act barred jurisdiction over the complaint and, in any event, that the agent had not been negligent.
 
 
 4
 The District Court, sitting without a jury, held that the "discretionary function" exception to the Federal Tort Claims Act did not bar the action. It found, however, that under Florida law the FBI agent had not been negligent. Accordingly, it entered judgment for the United States.
 
 
 5
 The first issue we face is whether this action is barred by the "discretionary function" exception to the Federal Tort Claims Act. The Government argues that the District Court erred in deciding that this exception did not apply and urges that the Judgment be affirmed on this ground, contending that law enforcement is the type of activity for which the United States may not be held liable.
 
 
 6
 The Federal Tort Claims Act constitutes a broad waiver of the United States' sovereign immunity from tort liability. The Act gives federal courts jurisdiction to hear actions
 
 
 7
 for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[2]
 
 
 8
 Before the Act's passage, victims of torts committed by federal employees had to pursue the cumbersome route of seeking a private relief bill from Congress. The Act's basic purpose was to relieve Congress of the burden of considering these bills and to entrust their consideration to the courts. United States v. Muniz, 374 U.S. 150, 153-54, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); Dalehite v. United States 346 U.S. 15, 24-25, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 703-704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Enacted as part of the Legislative Reorganization Act of 1946, the Act was meant "to provide for increased efficiency in the legislative branch of the Government."[3]
 
 
 9
 Certain exceptions were provided, however, which limited the waiver of immunity. Among these was the "discretionary function" exception, which the Government contends is applicable. It reasons that the FBI agent in charge of handling the hijacking had the "discretion to make an on-the-scene judgment as to the best course of action during the hijacking." Since there was "room for policy judgment," Appellee argues, the agent's actions fall within the discretionary function exception.
 
 
 10
 We recognize that the agent was called upon to use judgment in dealing with the hijacking. Judgment is exercised in almost every human endeavor. It is not the mere exercise of judgment, however, which immunizes the United States from liability for the torts of its employees.[4] Driving an automobile was frequently cited in the congressional reports leading to the Act as an example of "non-discretionary" activity which would be outside the discretionary function exception. Dalehite v. United States, 346 U.S. 15, 29-30, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Driving an automobile involves judgment. The failure to signal a turn, for example, may be said to represent an exercise of judgment, albeit a poor one. Yet, the automobile accident caused by a federal employee while on the job is the archetypal claim which Congress sought to place in the courts. If exercise of judgment were the standard for applying the discretionary function exception, a host of cases have been wrongly decided. These cases would include Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (failure to replace a burned-out lamp in a lighthouse); Rayonier, Incorporated v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) (failure completely to extinguish intermittently smoldering matter following a forest fire); Underwood v. United States, 356 F.2d 92 (5th Cir. 1966) (decision of psychiatrists to release airman from mental hospital and to provide him access to weapons), and Fair v. United States, 234 F.2d 288 (5th Cir. 1956) (decision to release homicidal patient).
 
 
 11
 A review of the language of the exception, the provision's legislative history, and the application of this section by the courts offers guidance in applying the exception.
 
 
 12
 The discretionary function provision is one part of an exception to the Tort Claims Act embodied in 28 U.S.C. § 2680(a). The text of that section reads as follows:The provisions of this chapter and section 1346(b) of this title shall not apply to
 
 
 13
 (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 14
 In our view, the first part of this section immunizes the Government from liability for the actions of a Government employee who is exercising due care in implementing a government policy as set forth in a statute or regulation. The second part of the provision, the discretionary function exception, immunizes Government employees while they are formulating policy.
 
 
 15
 The limited legislative history of the section supports this reading. A paragraph[5] discussing the provision, excerpted from testimony given in 1942 before the House Committee on the Judiciary by an Assistant Attorney General, states that liability should not arise "out of an authorized activity, such as a flood-control or irrigation project." The exception was " designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee." Claims arising out of "an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted." Congressional reports indicate that the regulatory functions of the FTC and SEC were the types of activity to be exempted by this exception.[6] The functions which this sparse legislative history indicates were to be excepted are those involving policy formulation, as distinguished from the day-to-day activities of persons not engaged in determining the general nature of the Government's business.
 
 
 16
 Supreme Court decisions have not extensively analyzed the exception. In Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court first discussed the discretionary function provision. The 4-3 majority opinion concluded that immunized discretion "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. (Footnote omitted) Where there is room for policy judgment and decision there is discretion." 346 U.S. at 35-36, 73 S.Ct. at 968. Later opinions have suggested a more restrictive view of the exception, without setting forth clear guideposts for decision. See Rayonier, Incorporated v. United States, 353 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).
 
 
 17
 Numerous Circuit and District Courts have struggled to mold the sparse legislative history and the language of Dalehite into a precise standard, often seizing upon the planning level operational level distinction as a ready solution to the problem. See, e. g., United States v. State of Washington, 351 F.2d 913 (9th Cir. 1965); White v. United States, 317 F.2d 13 (4th Cir. 1963); Mahler v. United States, 306 F.2d 713 (3d Cir.), cert. denied, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); United States v. Gregory, 300 F.2d 11 (10th Cir. 1962); Dahlstrom v. United States, 228 F.2d 819 (8th Cir. 1956); Eastern Air Lines, Inc. v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62, aff'd sub nom., United States v. Union Trust Company, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). Courts taking this approach have regarded discretionary acts of officials at the planning level as within the discretionary function exception and discretionary acts of operational level officials as outside the exception. This distinction is based on the status of the official making a judgment. While offering some general guidance, it is not a sufficient test for determining whether a Government employee's actions are within the exception. Cf. Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1345 (2d Cir. 1972); Barr v. Matteo, 360 U.S. 564, 572-73, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).
 
 
 18
 We believe that the basic question concerning the exception is whether the judgments of a Government employee are of "the nature and quality" which Congress intended to put beyond judicial review. See Smith v. United States, 375 F.2d 243, 246 (5th Cir.), cert. denied, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). Congress intended "discretionary functions" to encompass those activities which entail the formulation of governmental policy, whatever the rank of those so engaged. We agree with a commentator's analysis of the provision:
 
 
 19
 It would seem that the justifications for the exception do not necessitate a broader application than to those decisions which are arrived at through an administrator's exercise of a quasi-legislative or quasi-judicial function.[7]
 
 
 20
 In this case, the FBI agents were not involved in formulating governmental policy. Rather, the chief agent was engaged in directing the actions of other Government agents in the handling of a particular situation. FBI hijacking policy was not being set as an ad hoc or exemplary matter since it had been formulated before this hijacking. Hijacking policy had previously been promulgated in the FBI Handbook and in a memorandum jointly issued by the Departments of Transportation and Justice. While the Government's guidelines for dealing with hijackings are secret and must remain so, we note that Special Agent O'Connor was not making policy in responding to this particular situation.
 
 
 21
 The Government argues that United States v. Faneca, 332 F.2d 872 (5th Cir. 1964), cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965), supports its position that a law enforcement officer choosing among various available methods of enforcing the law in a given situation is performing a discretionary function under the Act. Faneca involved decisions made by Deputy Attorney General Katzenbach and James P. McShane, Chief of the Executive Office of the United States Marshals, in effecting the safe enrollment of a black student at the University of Mississippi. During the early 1960's Government efforts were underway to integrate colleges and universities throughout the nation. The policy formulated by Katzenbach and McShane was meant to influence and did inevitably serve to guide the actions of other government officials faced with similar situations. The Faneca Court recognized that in responding to this particular situation, the Government employees were performing a "discretionary function," as they were determining law enforcement policy.
 
 
 22
 When a response to a particular situation does not have the policy overtones involved in Faneca, however, courts have scrutinized the day-to-day activities of law enforcement officers. See, e. g., Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Howell v. Cataldi, 464 F.2d 272 (3d Cir. 1972); Jones v. Perrigan, 459 F.2d 81 (6th Cir. 1972); Bivens v. Six Unknown Named Agents, 456 F.2d 1339 (2d Cir. 1972);[8] Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), rev'd on other grounds, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1972), is instructive in this regard. In Carter a policeman was sued for making an arrest without probable cause. The District of Columbia Court of Appeals concluded that the officer was not subject to suit if he was performing a "discretionary" rather than "ministerial" function. The Court noted that the exercise of "discretion" by the officer in the sense of choosing among alternative courses of action does not automatically trigger official immunity:
 
 
 23
 The proper approach is to consider the precise function at issue, and to determine whether an officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct. 447 F.2d at 362.
 
 
 24
 It is clear that making an arrest involves the exercise of discretion. For purposes of official immunity, however, the fiction that making an arrest is not "discretionary" is maintained because protection of personal liberties is thought to outweigh the danger of less effective law enforcement out of fear of personal tort liability. Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1346 (2d Cir. 1972).
 
 
 25
 The prospect of governmental liability for the actions of law enforcement officers should not cause those officers less vigorously to enforce the law.[9] The need for compensation to citizens injured by the torts of government employees outweighs whatever slight effect vicarious government liability might have on law enforcement efforts.
 
 
 26
 We believe that Congress intended that this action be tried in the courts, not in the halls of Congress. To decide otherwise would be to ignore the "sweeping language" of the Act, the "general trend toward increasing the scope of the waiver," and the need to avoid "whittl(ing) it down by refinements." United States v. Yellow Cab Co., 340 U.S. 543, 547, 550, 71 S.Ct. 399, 404, 95 L.Ed. 523 (1951). We agree with the District Court, for these reasons, that the discretionary function exception does not apply, and we affirm the District Court's findings on this point.
 
 
 27
 The second issue presented is whether the District Court erred in finding that the FBI agent in charge of handling the hijacking was not negligent. This question has two aspects whether the District Court used the proper test for negligence and whether its ultimate finding was correct.
 
 
 28
 The District Court properly looked to Florida law for the standard of negligence to be applied, since Florida is where the allegedly negligent acts occurred. 28 U.S.C. § 1346(b); Freeman v. United States, 509 F.2d 626, 629 (6th Cir. 1975); Bibler v. Young, 492 F.2d 1351 (6th Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974).
 
 
 29
 Florida law, the District Court determined, holds FBI agents to the standard of conduct of "the reasonable FBI agent" in the same circumstances:
 
 
 30
 To recover in this case plaintiffs must . . . show that Agent James O'Connor's decisions, upon which liability is sought to be predicated, exposed their decedents to a risk of harm which was unreasonable under the circumstances and which could have been expected to and did come to pass. The risk must have been an appreciable one at the time and under the existing circumstances, and it is not enough that in retrospect O'Connor's conduct can be viewed as unreasonable in light of subsequent events. The law, as set forth in the Restatement (Second), Torts § 289, requires O'Connor to have recognized that his conduct involved an unreasonable risk of harm to innocent persons aboard the hijacked aircraft if a reasonable man would have done so while exercising (a) such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have; and (b) such superior attention, perception, memory, knowledge, intelligence and judgment as the actor himself has. (Footnote omitted) Thus, the standard in this case is of a reasonable FBI agent. 382 F.Supp. at 751-752.
 
 
 31
 Our review of Florida law convinces us that the District Court's standard was correct. See Cleveland v. City of Miami, 263 So.2d 573, 578 (Fla.1972); Holland v. Mayes, 155 Fla. 129, 19 So.2d 709, 711 (1944); Miriam Mascheck, Inc. v. Mausner, 264 So.2d 859, 861 (Fla.App.1972).
 
 
 32
 Appellants contend that the District Court erred in applying this standard. They argue that we are free to draw our own conclusions as to whether the record requires a finding of negligence. The rule in this Circuit is, however, that a finding of negligence or the absence thereof will not be set aside unless the District Court's determination is "clearly erroneous," under Rule 52, Fed.R.Civ.P. Gowdy v. United States, 412 F.2d 525, 532-33 (6th Cir.), cert. denied, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969), reh. denied, 396 U.S. 1063, 90 S.Ct. 750, 24 L.Ed.2d 756 (1970). Thus, we may not set aside the District Court's finding that the FBI agent in charge of handling the hijacking was not negligent unless "on the entire evidence (we are) left with the definite and firm conviction that a mistake was committed." Parmer v. National Cash Register Co., 503 F.2d 275, 277 (6th Cir. 1974), quoting, United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
 
 
 33
 To determine whether it is clear that the FBI Agent who handled the hijacking did not meet the standard of the reasonable FBI agent in the same circumstances, as Appellants argue, we must reconstruct the situation as seen through the eyes of Special Agent O'Connor. While we need not repeat the thorough summary of facts in the District Court's opinion, a summary of what O'Connor knew and what actions he took based on his knowledge is necessary to determine whether the District Court's ultimate finding must be overturned.
 
 
 34
 James J. O'Connor served as the Assistant Special Agent at the FBI's Jacksonville regional office and was second in command of that office's 78 agents at the time of the hijacking. O'Connor had been an FBI agent for 21 years and had been at the Jacksonville office about seven years.
 
 
 35
 At approximately 4:05 a. m., on October 4, 1971, O'Connor was awakened at his home by a call from Special Agent Russell J. Pardee, the night duty agent at the Jacksonville FBI Office. O'Connor was informed that a private plane had been forcibly hijacked from Nashville, Tennessee, and would likely be landing at Jacksonville International Airport at approximately 5:00 a. m. O'Connor instructed Pardee to notify various FBI personnel with skills necessary for handling a hijacking and to have them report to the airport.
 
 
 36
 At 4:15 a. m. Pardee informed O'Connor that the hijacked airplane was now expected to arrive at approximately 5:15 a. m. and would be directed to the private aircraft storage area (Air Kaman) at the airport. O'Connor then left for the airport in his family car, which was not equipped with a two-way radio, and arrived at the airport at approximately 4:50 a. m.
 
 
 37
 Familiar with the layout of the airport by virtue of an earlier tour of its facilities in preparation for such an eventuality, O'Connor drove directly to the Air Kaman hangar. Seeing no other agents on the scene, he placed a third call to the Jacksonville FBI office. Pardee told O'Connor that the pilot had radioed the Jacksonville tower requesting fuel, equipment to restart his plane, and various other items including maps and flotation gear for a flight to Freeport, Bahamas.
 
 
 38
 Shortly after 5:00 a. m., Special Agent George H. Murphy arrived at Air Kaman in a Bureau car and rendezvoused with O'Connor. Special Agent Francis A. Burns, Jr., had ridden to the airport with Murphy and had positioned himself in the flight control tower to handle radio communication with the hijacked airplane. O'Connor was able to use the two-way radio in Murphy's Bureau car to communicate with Burns and with the Jacksonville FBI office. O'Connor could not, however, monitor the conversations between Burns and the airplane.
 
 
 39
 At approximately 5:10 a. m., Burns notified O'Connor that the hijacked plane was landing. At about the same time Pardee told O'Connor that apparently two armed men had hijacked the airplane and had dragged a woman aboard the aircraft who reportedly was the wife of one of the subjects, and that the hijacker and his wife apparently had a long history of marital difficulties.
 
 
 40
 Upon hearing that the hijacked plane was landing, Murphy and O'Connor drove to the corner of the private airplane storage ramp to the southwest of Air Kaman and turned out the automobile's lights. At approximately 5:15 a. m. the hijacked airplane taxied into the storage area, made a 180-degree turn to face back down the taxiway toward the runway, and came to a stop with the engines still running.
 
 
 41
 While the plane was taxiing toward the storage ramp, Special Agents Mayo and McBride arrived at the airport and stationed themselves behind some gasoline trucks about 200 yards from the airplane. Apparently the radio exchange between Burns and Mayo and McBride alerted O'Connor to the arrival of the latter two agents. O'Connor ordered them to hold their position.
 
 
 42
 While O'Connor was communicating with Mayo and McBride, Burns took the tower microphone and contacted the hijacked aircraft stating, "This is the FBI speaking. Cut your engines." The pilot responded that he was the Captain and that he was going to cut his engines, but that he needed fuel, and he requested that the area be cleared of personnel.
 
 
 43
 Burns then notified O'Connor that he had radio contact with the pilot of the airplane. Burns told O'Connor that the pilot had repeated his requests for fuel and a starter. O'Connor told Burns that there would be no fuel or starter provided. Burns relayed the no fuel message to the pilot. During this conversation the pilot informed Burns and Burns told O'Connor that the hijacker had 12.5 pounds of plastic explosives aboard.[10] O'Connor told Burns, Mayo and McBride that he thought the airplane might attempt to take off.
 
 
 44
 It was now 5:20 a. m. Burns radioed O'Connor to tell him that he had relayed the message. O'Connor told Burns, Mayo, and McBride that the situation appeared to be a "waiting game" and that no one was to move until he gave an order. O'Connor also stated that the hijacker was armed and that only a pilot and two passengers were known to be on the aircraft.
 
 
 45
 At this point, the left engine of the hijacked airplane was shut down to allow an individual to leave the plane. O'Connor and Murphy got out of their car and identified themselves to the individual, who turned out to be co-pilot Randall Crump. Crump had been sent to negotiate for fuel. O'Connor testified that Crump stated that there were two armed men aboard, that one of the armed men was in possession of an explosive device, that the woman was calm now but had been hysterical, and that the hijacker had been drinking and might force the airplane to take off without refueling. Crump, on the other hand, testified that O'Connor elicited very little information from him. Crump also stated that when told that explosives were aboard, O'Connor said that was a "bunch of malarky." The District Court found "that O'Connor did not attempt to solicit information descriptive of the mental state of Giffe or his supposed accomplice." 382 F.Supp. at 725.
 
 
 46
 Three or four minutes after Crump deplaned, Bobby Wayne Wallace, the hijacker's associate, exited the airplane. O'Connor and Murphy quickly took Wallace into custody. Wallace indicated that the hijacker was upset and that he had been sent out to bargain for fuel. Wallace, who had a cocked, loaded pistol tucked into his trousers, was disarmed and placed under arrest for air piracy and, consistent with FBI regulations, was not questioned further after his arrest.
 
 
 47
 At this point, fifteen minutes after the plane had come to a stop, O'Connor decided to employ forcible intervention in order to prevent the plane from departing. O'Connor ordered Mayo and McBride to move their car to block the plane's route back down the taxiway and ordered Murphy to shoot out the plane's right rear tire. Two shots failed to deflate the tire. O'Connor then approached the plane, identified himself, and ordered all the occupants to leave the plane. Two shots were fired from inside the plane in O'Connor's direction. O'Connor attempted unsuccessfully to deflate the left rear tire with pistol fire. O'Connor then ordered McBride to shoot out the right engine. When the engine was silenced, O'Connor heard moaning, looked into the plane, and discovered the two dead hostages and the fatally wounded hijacker.
 
 
 48
 The District Court concluded that O'Connor's actions throughout the incident did not amount to negligence. Although moved by the tragic outcome of the FBI's response to the hijacking, the District Court made this ultimate finding:
 
 
 49
 In conclusion the court finds that O'Connor's challenged decisions were not an unreasonable response under all the circumstances. In traditional negligence terms, O'Connor was under a duty to choose a course of action which would maximize the hostages' safety, and to attempt a capture of the hijacker only if possible by means compatible with the greater interest. While the FBI obviously cannot undertake to guarantee the safety of persons in this situation, the means employed to effect any capture should be consonant with that which would provide the maximum assurance possible that hostages would not be harmed as a result. This duty was breached unless there reasonably appeared a better-suited alternative to protecting the hostages' well-being. To the court it seems obvious that the proper decision in this situation is a matter on which reasonable minds could differ; but viewed objectively and without the benefit of hindsight, the court is unable to conclude that the alternatives chosen by Agent O'Connor were unreasonable. 382 F.Supp. at 755.
 
 
 50
 We are convinced that this finding is clearly erroneous. There did exist, from foresight, "a better-suited alternative to protecting the hostages' well-being." That choice was not to intervene forcibly but to continue the " waiting game."
 
 
 51
 We recognize that law enforcement officers must make split-second, difficult decisions when confronted with emergency situations. As the District Court pointed out, however, the extent to which "an actor will be excused for errors in judgment under (emergency) circumstances is qualified by training and experience he may have, or be expected to have, in coping with the danger or emergency with which he is confronted." 382 F.Supp. at 752.
 
 
 52
 Agent O'Connor was trained to handle dangerous situations. He must be held to the standard of the reasonable FBI agent with training in handling such affairs. Indeed, although O'Connor himself had not previously been involved in handling a hijacking, he was familiar with the FBI Handbook's guidelines and the Jacksonville intra-office memorandum on hijackings. While these documents must be kept secret, it is significant that they place a far greater emphasis on hostage safety and pilot cooperation than O'Connor did in confronting his problem. As the District Court stated, "O'Connor's actions did not strictly comply with FBI guidelines." 382 F.Supp. at 755. Indeed, our review of O'Connor's actions convinces us that O'Connor violated FBI policy and disregarded the substance of the Guidelines, thereby directly resulting in the deaths of the pilot and the hijacker's estranged wife.
 
 
 53
 While we agree with the District Court that the failure to comply with FBI policy is not a basis for a finding of negligence per se, 382 F.Supp. at 755, we are less willing than the District Court to diminish the importance of the fact that O'Connor failed to act in accordance with procedures intended to maximize hostage safety, short of complying with unreasonable hijacker demands.
 
 
 54
 We find, furthermore, that O'Connor was clearly unreasonable in turning what had been a successful "waiting game," during which two persons safely left the plane, into a "shooting match," which left three persons dead.
 
 
 55
 O'Connor's reasons for choosing force rather than continued delay were confused and contradictory. O'Connor reasoned that when the hijacker released his associate he demonstrated a rational state of mind and might at that point have been expected to respond reasonably to the agents' disabling of the plane. Yet, O'Connor, also concluded that the hijacker would react in an irrational and violent manner to continued delay.
 
 
 56
 Another of O'Connor's stated reasons for disabling the plane's right engine was to facilitate communication. Yet, up to that point O'Connor had experienced no difficulty communicating with his fellow agents or with the control tower.
 
 
 57
 O'Connor's basic fear was that the airplane would depart, with what he had heard was less than thirty minutes of fuel left. He reasoned that the hostages would have had a better chance of surviving an on-the-ground assault than "continued flight into the unknown," as the District Court described it. 382 F.Supp. at 754. Yet, the plane had made no movement away from its landing berth, and if delay had continued for a while longer, the plane might have run out of fuel while on the ground, thus accomplishing the purpose of the armed assault without provoking an irrational reaction from the hijacker. In addition, the hijacker had said, "Let's get out of here," upon first hearing the no fuel decision, but the pilot had not complied with the request and the hijacker instead let both the co-pilot and an apparent accomplice leave the plane to bargain for fuel. Thus, the hijacker himself had decided to participate in the "waiting game," and there was no reason to suppose that the plane was about to depart when O'Connor ordered the aircraft forcibly disabled.
 
 
 58
 The District Court framed only two action alternatives as having been available to O'Connor: (1) the forcible termination chosen by O'Connor or (2) acquiescence in the aircraft's departure. We believe that additional delay and an attempt to reason with the hijacker were other options which were open to O'Connor, and these options were particularly proper in view of the pilot's insistence that armed intervention would result in disaster. We believe a reasonable FBI agent would have tried additional delay and would have ordered an attempt to reason with the hijacker. By the timing of his decisions, O'Connor backed the hijacker into a corner. Force or immediate surrender became the hijacker's only options. Special Agent O'Connor grossly miscalculated in assuming the hijacker would respond peacefully to a show of force.
 
 
 59
 Where one trained in the field of law enforcement is called upon to make a judgment which may result in the death of innocent persons, he is required to exercise the highest degree of care commensurate with all facts within his knowledge. Such care must be exercised in order to ensure that undue loss of life does not occur. We believe that Agent O'Connor failed to exercise such care.
 
 
 60
 Accordingly, we are firmly convinced that the District Court was in error in finding that Special Agent O'Connor was not negligent in handling the hijacking. We hold that the District Court's conclusion as to negligence was clearly erroneous and must be reversed.
 
 
 61
 This conclusion applies not only to the wrongful death claims of the victims' survivors, but also to the claim of the aircraft's owner, who sued for property damage inflicted during the agents' assault. BBAI's claim was based on the theory of trespass rather than negligence, as it involved the allegation that the intentional shooting of the plane was not privileged by the agents' conduct. See Hatahley v. United States, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065 (1956). The rule for determining whether the agents' trespass was privileged is found in the Restatement (Second), Torts § 265:
 
 
 62
 One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority.
 
 
 63
 See Rodriquez v. Jones, 473 F.2d 599 (5th Cir.), cert. denied, 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed.2d 1007 (1973); Whirl v. Kern, 407 F.2d 781 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969); Foster v. United States, 296 F.2d 65 (5th Cir. 1961); Giacona v. United States, 257 F.2d 450 (5th Cir.), cert. denied, 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958).
 
 
 64
 As a comment to the Restatement makes clear, a law enforcement officer is privileged to commit a trespass if he is exercising his lawful authority and if he "exercise(s) it in a reasonable manner, causing no unnecessary harm.[11] A further comment states,The rule . . . is applicable . . . to one acting in a reasonable effort to prevent the commission of a crime or to detain a dangerous lunatic, where the intermeddling is reasonably necessary to effect the exercise of such privilege, duty, or authority.[12]
 
 
 65
 If Agent O'Connor had acted reasonably in deciding forcibly to disable the plane, his trespass would clearly have been privileged. See Rodriguez, Foster, and Giacona, supra. Since we have held that his decision to disable the plane was unreasonable, it follows that the trespass was not "reasonably necessary" to perform his duty and his authority was not exercised "in a reasonable manner." Thus, his trespass was wrongful and was not shielded by privilege.[13] See Hatahley v. United States, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065 (1956). BBAI's claim for damage to the aircraft must be allowed.
 
 
 66
 Ordinarily, our consideration would end here, as a remand would be necessary to compute the damages to be awarded. The District Court, however, took the unusual step of computing damages, so that in the event of reversal Appellants' relief would not be delayed for reasons of judicial administration. Given the importance of this case and the need to compensate the victims' relatives promptly if relief were found appropriate on appeal, we applaud the District Court's diligence in not disposing of the case on a piecemeal basis.
 
 
 67
 The District Court determined that, if liability existed, Mrs. Downs, the pilot's widow, for herself and her children was entitled to $269,441; Major and Mrs. Lakich, as legal guardians of the daughter of the hijacker's wife, were entitled to $56,958; and Big Brother Aircraft, Inc. (BBAI), the owner of the airplane, was entitled to $62,131.98.
 
 
 68
 The Downs survivors cite as error (1) awarding damages in the amount of the present value of lost future support rather than the present value of decedent's future earnings; (2) reducing the award by the amount of decedent's estimated future federal income tax liability; and (3) failing to take into account likely increases in decedent's annual earnings. The Lakich Appellants argue that the first two alleged errors were also present in the computation of their award.
 
 
 69
 Appellants' first contention is that since Mrs. Downs brought her action jointly as widow and administratrix of decedent's estate, her recovery should be the higher amount allowed an administratrix under Florida law, rather than the amount due her as a widow. Mrs. Downs, however, amended her complaint to bring her suit as Downs' widow, and the District Court held her to that status. In any event, the District Court would have had to dismiss Mrs. Downs' suit as administratrix because Mrs. Downs as widow would have had a higher priority of claim. Benoit v. Miami Beach Electric Co., 85 Fla. 396, 96 So. 158 (1923).
 
 
 70
 The Florida Wrongful Death Act was completely revised in 1972. The new act went into effect on July 1, 1972, and does not apply to deaths occurring before that date. Actions based on deaths occurring prior to July 1, 1972, are governed by Florida Statutes §§ 768.01-.03 (1971), the former wrongful death statute. McKibben v. Mallory, 293 So.2d 48 (Fla.1974). The deaths in this case occurred on October 4, 1971, and the old wrongful death statute is thus controlling.
 
 
 71
 The former statute based damages for wrongful death on a hierarchy of categories depending on relationship to the deceased, beginning with surviving spouse as the highest, then minor children, persons dependent upon the deceased for support, and finally the administrator or executor of the decedent's estate. A wrongful death action could only be brought by the individual or individuals in the highest category. The individuals bringing suit could recover only for their own loss of support, and indirect recovery on behalf of others was not permitted. W. B. Harbeson Lumber Co. v. Anderson, 102 Fla. 731, 136 So. 557 (1931). The effect of the former statute is succinctly stated at 9A Fla.Jur. 448:
 
 
 72
 The existence of any class of persons authorized to sue under the statute bars other classes from any right of action or from participation in the recovery of the preferred class, in most cases.* Thus, an administrator cannot maintain an action on behalf of the estate of the decedent, unless there is no surviving spouse, minor child, or dependent. * (Footnote omitted)
 
 
 73
 The exception to this rule was that the existence and number of minor children could be considered when awarding damages to a widow. Slaughter v. Cook, 195 So.2d 6 (Fla.App.1967).
 
 
 74
 Under the wrongful death statute as it existed in 1971, a surviving widow or dependent child was entitled to recover for lost care and support, based upon the husband's or father's probable future earnings and other acquisitions, and the station in life he would probably have reached. Seaboard Air Line R. R. v. Martin, 56 So.2d 509 (Fla.1952), overruled on other grounds, Loftin v. Nolin, 86 So.2d 161 (Fla.1956); Florida Cent. & P. R. R. v. Foxworth, 41 Fla. 1, 25 So. 338 (1899). The former wrongful death statute allowed an administrator to recover the full value of the loss to the prospective estate of the deceased. Ellis v. Brown, 77 So.2d 845 (Fla.1955).
 
 
 75
 Because of the priority of claims established by former Fla.Stat. § 768.02, Mrs. Downs, as widow, was limited to recovering the present value of lost support. This reasoning likewise requires rejection of the Lakich Appellants' argument on this point. We affirm the District Court's holding in this regard.
 
 
 76
 Appellants next assert that the District Court erred in reducing the damage awards by the amount of decedents' future federal income tax liability, citing St. Johns River Terminal Co. v. Vaden, 190 So.2d 40 (Fla.App.1966). The Vaden Court concluded that a trial judge should not instruct the jury that its damage award in a wrongful death action is subject to reduction by projected federal income taxes. Among the reasons given for this position was the Court's belief that interjection of tax computations would unduly confuse the jury.
 
 
 77
 When a District Court is sitting without a jury, the rationale behind Vaden is of little force. Florida courts have not squarely addressed the precise issue raised here, however, and there is a split of authority in other jurisdictions.[14] The District Court concluded that if wrongful death awards were proper in this case, they should be based on "actual support" which would have been received, so that the award had to be reduced by decedents' estimated tax liability. The new Florida Wrongful Death Act requires that taxes be deducted. Fla.Stat. § 768.18(5)(1972). Accordingly, we do not believe that the District Court erred in reducing damage awards based on actual lost support by the amounts of decedents' projected Federal income tax liability.
 
 
 78
 Finally, Appellants contend that the District Court erred by not taking into account likely substantial increases in Downs' annual earnings. The District Court noted that at the time of his death Downs had gross annual earnings of $9600 and a net after-tax income of $7200. In determining Downs' future income for purposes of computing damages the Court based its computations on an annual after-tax-income of $9600. Thus, the Court took into account a sizeable increase in Downs' future earnings, noting that such an increase was reasonable considering Downs' age, health, and industry.
 
 
 79
 Although the manner in which the District Court allowed for an increase in Downs' earnings is not based on precise or scientific calculations, the amount representing the increase appears to be within the range of reason. The general Florida rule on reviewing damage awards is stated in Schmidt v. Tracey, 150 So.2d 275 (Fla.App.1963), cert. denied, 159 So.2d 645 (Fla.1964):
 
 
 80
 The test (in determining the adequacy of damages on appeal) is not what amount (the appellate court) would have allowed had it tried the case, but whether the jury, as reasonable men, could have found the verdict which they did. 150 So.2d at 276.
 
 
 81
 See also Sebold v. Bushman, 230 So.2d 198 (Fla.App.1970). The rule is no different when a judge acts as the finder of fact, as the District Court did here.
 
 
 82
 The District Court's computation of damages spanned ten pages. 382 F.Supp. at 734-743. We conclude that the District Court was not only reasonable but admirably thorough and precise in its formulation of damages in this complicated situation, and we affirm the amounts as found below.
 
 
 83
 Although we must reverse the District Court's ultimate holdings, we commend the District Judge for his sensitive handling of the case and his thorough statement of findings and conclusions. The Judgment is reversed and the cause remanded to the District Court for entry of judgment for Appellants.
 
 
 
 [1]
 28 U.S.C. §§ 1346(b), 2671-2680 (1970)
 
 
 [2]
 28 U.S.C. § 1346(b)
 
 
 [3]
 Chapter 753, 60 Stat. 812 (1946)
 
 
 [4]
 See generally 2 F. Harper & F. James, The Law of Torts 1658 (1956)
 
 
 [5]
 See Dalehite v. United States, 346 U.S. 15, 29-30 n. 21, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), for text of paragraph
 
 
 [6]
 H.R.Rep. No. 2245, 77th Cong., 2d Sess. 10 (1942); S.Rep. No. 1196, 77th Cong., 2d Sess. 7 (1942)
 
 
 [7]
 Developments in the Law Remedies against the United States and its Officials, 70 Harv.L.Rev. 827, 896 (1957)
 
 
 [8]
 As Professor Jaffe has written, "(T)here are areas, notably actions against police officers for false arrest, battery, and trespass, and actions for summary destruction of property and improper collection of taxes, where recovery has long been allowed, despite the exercise by the officers of more than a 'merely ministerial' function. This is particularly clear in the case of police officers, who are called upon to make extremely difficult factual choices, and important, if unarticulated, policy decisions." Jaffe, "Suits against Governments and Officers: Damage Actions," 77 Harv.L.Rev. 209, 218-19 (1963)
 
 
 [9]
 See 2 F. Harper & F. James, The Law of Torts 1661-65 (1956)
 
 
 [10]
 The following is taken from the FAA transcript of the conversation between Agent Burns in the tower (T) and the pilot of the hijacked airplane (P):
 P: 58 November. This is the captain speaking. We're going to cut engines and we're gonna need some fuel but I request that everyone stay away.
 T: 58 November. Advise when your engines have been cut.
 T: 58 November?
 P: This is 58 November. Uh, this gentleman has about 12.5 pounds of plastic explosives back here, and (pause) uh, I got no (pause) uh, yen to join it right now so I would please expr. uh, appreciate it if you would stay away from this airplane.
 T: That's a roger, 58 November. Are your engines cut?
 P: Negative.
 T: Standby.
 P: Where's the fuel truck?
 T: 58 November?
 P: 58 November. Go ahead.
 T: This is the FBI. There will be no fuel. Repeat. There will be no fuel. There will be no starter. Have you cut your engines.
 P: Uh, look, I don't think this fellow's kiddin' I wish you'd get the fuel truck out here.
 T: 58 November. There will be no fuel. I repeat. There will be no fuel.
 P: This is 58 November. You are endangering lives by doing this, and uh, we have no other choice but to go along, and uh, uh, for the sake of some lives we request some fuel out here, please.
 T: 58 November. What is the status of your passengers?
 P: Ah, uh, well, they're okay, if that's what you mean.
 T: Are they monitoring this conversation?
 P: Yes, they are.
 T: Do you have two passengers aboard?
 T: 58 November. What's your present fuel status on that aircraft?
 P: We're down to about thirty minutes.
 T: 58 November. The decision will be no fuel for that aircraft. No starter. Run it out, any way you want it. Passengers, if you are listening the only alternative in this aircraft is to depart the aircraft, to depart the aircraft.
 
 
 [11]
 Restatement (Second), Torts (1965), comment (a) to § 265, at 500
 
 
 [12]
 Id., comment (e) to § 265, at 500
 
 
 [13]
 In a similar context, the Restatement (Second), Torts § 204, comment (g), at 383 (1965), states, "Since the privilege (to enter another's land to make an arrest) is ancillary to the privilege to make an arrest, it cannot exist unless the arrest made or sought to be made is itself privileged."
 
 
 [14]
 Tax should not be considered:
 Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308 (2d Cir. 1964) (applying New York law); Bonner v. United States, 339 F.Supp. 640 (E.D.La.1972); Plourd v. Southern Pacific Transportation Co., 266 Or. 666, 513 P.2d 1140 (1973); Hinzman v. Palmanteer, 81 Wash.2d 327, 501 P.2d 1228 (1972).
 Tax should be considered:
 Runyon v. District of Columbia, 150 U.S.App.D.C. 228, 463 F.2d 1319 (1972) (applying District of Columbia law); O'Connor v. United States, 269 F.2d 578 (2d Cir. 1959) (applying Oklahoma law); Adams v. Deur, 173 N.W.2d 100 (Iowa 1969).