Joseph S. IVERY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 80–1789.

United States Court of Appeals, Sixth Circuit.

Argued March 22, 1982.

Decided Aug. 17, 1982.

Rehearing and Rehearing En Banc Denied Sept. 22, 1982.

David H. Fried, Fried & Sniokaitis, Detroit, Mich., E. R. Whinham, Southfield, Mich., for plaintiff-appellant.

James K. Robinson, U. S. Atty., Patricia G. Reeves, Sheldon Light, Asst. U. S. Attys., Detroit, Mich., for defendant-appellee.

Before MERRITT and JONES, Circuit Judges and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

■ Joseph S. Ivery (Ivery) has appealed to this court from a summary judgment entered against him in his action for malicious prosecution, which he filed against the government in the federal district court for the Eastern District of Michigan under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* In his complaint, filed on June 21, 1979, he alleged that the Postal Inspector employees of the United States Postal Service participated in swearing out a criminal complaint in the federal district court in which it falsely, maliciously and with no probable cause accused him of having committed a crime of stealing money from the United States Mails in violation of 18 U.S.C. § 1709, which resulted in an indictment, trial and his acquittal by a jury. He further alleged that as a proximate result of the defendant's accusations and complaints, he lost his job as a part-time flexible carrier and has not been able to get another and has suffered much humiliation and distress for all of which he prayed for judgment against the United States for $500,000 actual damages, $500,000 punitive damages, plus costs, interest and attorney's fees.[1]

Ivery neglected to mention in his complaint that prior to his criminal trial he had pursued civil remedies against the Postal Service for his wrongful discharge from his employment as a mail carrier, by filing a grievance under the Collective Bargaining Agreement entered into between the Postal Service and the labor union, the National Association of Letter Carriers, and pursuing the grievance to and including arbitration. In the arbitration hearing, he was represented by counsel and the arbitrator conducted an extensive evidentiary hearing at which Ivery, the Postal Inspectors and others testified at length as to the facts of the entire case.

In a five page single-spaced opinion dated December 12, 1978, the arbitrator stated the only issue:

Was Grievant discharged for just cause?

The arbitrator found the facts and rendered his opinion in which he determined that the grievant had been discharged for just cause.

The arbitrator found the facts as follows:

### Facts

Grievant had been hired by the Postal Service on December 18, 1976, as a part-time flexible carrier. He was discharged on May 26, 1978, as a result of an investigation by Postal Inspectors on May 3, 1978.

The Postal Inspection Service had received a number of complaints from customers on Grievant's letter collection route to the effect that mail which had been addressed to them had never been received. As a result of those complaints, the Postal Inspection Service undertook a routine investigation.

As was the custom, such investigation was carried out in the following manner: The Postal Service had determined that a frequently missed item on Grievant's collection route were greeting cards which allegedly contained currency. The Postal Service therefore prepared two letters giving the appearance of greeting cards, and inside the cards inserted a total of $13.00 in currency, made up of one-dollar and two-dollar bills. The serial numbers of the bills were recorded, and identifying dots were placed after the signature on the bills. A third piece of mail, a worthless circular, was also prepared to be mailed as a control item, along with the other two pieces of mail.

The Postal Inspectors then placed the three items of mail in a standard mail box on Grievant's collection route, and parked a block or so away in a position to observe the box continuously. The mail was placed in the box by Postal Inspectors some 10 or 15 minutes prior to Grievant's expected arrival at the box. Between the placement of the mail in the box and Grievant's emptying of the box

---

1. Apparently either the plaintiff or his lawyer did not know that the government is not liable for exemplary damages or for prejudgment interest nor for attorney's fees, unless specifically authorized by statute.

as part of his collection duties, one other postal patrol made a deposit of mail.

According to their testimony, in due time the Postal Inspectors observed Grievant come to the box with his mail truck and empty the contents of the box into his truck. After he left the box, the Postal Inspectors immediately went to the box to make sure that all of the mail had been emptied from it. After this was done, the Postal Inspectors then followed Grievant.

While those particular Postal Inspectors were not able to follow Grievant continuously, Grievant was continually followed by Postal Inspectors in radio contact with each other from the time Grievant left the box under observation until the time he arrived at his post office. At no time was Grievant observed to have thrown anything from his vehicle or from the box, nor was he observed to have made any stops which would have enabled him to open mail or secrete mail.

When Grievant arrived at his post office, he parked his truck at the loading dock, as was his custom, and then went inside to report his arrival. Mailhandlers then emptied the mail from his truck into a postage department hamper called a "Gurney". One Postal Inspector immediately inspected the Gurney, and found the worthless piece of mail which had been planted as a control. The two pieces of mail containing the currency were not found.

Grievant stopped at a restroom, and then left the post office building to go to his car, which was parked behind the building and near a gasoline service station. According to one Postal Inspector, he approached Grievant with the intention of arresting him, and observed Grievant counting currency. He immediately advised Grievant that he was under arrest, and ordered Grievant from his vehicle. He noticed that Grievant had a bill in his hand with an identifying mark on it. Grievant was taken to a postal vehicle in which two other Postal Inspectors were seated. At that point, they examined about half of the currency which

Grievant had in his possession, and identified several more bills.

Grievant was then taken to the Postal Inspector's office in the post office, where an inventory of the bills [was] completed. According to the Postal Inspectors, at no time were the bills away from the presence of Grievant until after the final inventory of the bills. All of the marked money was in Grievant's possession.

According to Grievant's testimony, he did not open any mail, nor did he take any money from any mail. His explanation for his possession of the marked money was that for a period of approximately 45 minutes to an hour while he was being interrogated, one Postal Inspector took the money in his possession—approximately $121.00—and left the room with it. Grievant stated that the marked money was discovered and counted after the Postal Inspector had returned after this absence of 45 minutes to an hour. Grievant further testified that when he was originally approached by the Postal Inspectors, he was not counting any money, but had just started his car. He intended to drive into the gasoline service station to buy some gasoline, and had a $10.00 bill in his hand. His explanation for having two-dollar bills in his possession was that he had received them in the usual course of his daily affairs.

Grievant was given an immediate suspension on May 3rd on the ground that the Postal Service had reasonable cause to believe that he was guilty of a crime for which a sentence of imprisonment could be imposed. On May 26th he was discharged for having in his possession the cash contents of the missing letters.

■ There was no contrary proof offered by Ivery at the hearing that money from mail in his route was being pilfered and it was the duty of the Postal Inspectors to investigate it and to bring criminal charges against the perpetrator. The Postal Inspectors had no previous contact of any kind with Ivery and did not even know him and were found by the arbitrator to have had no

motive for framing Ivery in the criminal charges. The arbitrator simply did not believe the cock and bull story of Ivery that he was framed. It was the function of the arbitrator in reaching his decision to make credibility assessments. He credited the testimony of the three or four Postal Inspectors. He disbelieved the uncorroborated testimony of Ivery that he was framed. He found that Ivery was caught red-handed with the marked money in his possession. This meant that the Postal Inspectors had more than probable cause to arrest and prosecute Ivery as he was found to have actually pilfered the money from the mails. It also provided just cause for his discharge. The fact that Ivery was subsequently acquitted on the criminal indictment, after the arbitration award, has no bearing on the subject. The arbitrator's award at that time was final and was not subject to review, as no appeal had been prosecuted therefrom. Furthermore, in a criminal trial, the proof must be beyond a reasonable doubt, whereas, in civil proceedings, such as arbitration, the proof need be only by a preponderance of the evidence or by clear and convincing evidence. The fact of his acquittal merely means that the evidence against him was not beyond a reasonable doubt necessary to support his conviction.

■■■ Ivery contends that the arbitrator had no authority under the collective bargaining agreement to hear and determine tort claims, but could deal only "with wages, hours and working conditions." It is submitted that whether Ivery was wrongfully discharged dealt with working conditions and the arbitrator had full power and authority to determine whether he was wrongfully discharged. The effect of this adjudication in a civil action is another matter. In his action under the Federal Tort Claims Act, Ivery sought to recover damages for his wrongful discharge. He is not entitled to recover damages for wrongful discharge because in the prior civil matter it was adjudged that he was not wrongfully discharged. Ivery also could not recover damages in his Federal Tort Claims action for malicious prosecution if the Postal Service had probable cause to have him arrest-

ed and prosecuted. In the arbitration proceedings, it was determined that the Postal Service not only had probable cause, but that Ivery actually pilfered the money from the mails. Thus the necessary element of lack of probable cause to support his action under the Federal Tort Claims Act was adjudicated against Ivery in the civil arbitration. Ivery could not bring a suit for reinstatement to his job after the arbitrator had rendered a final unappealed decision. Nor could he sue for damages in any court for wrongful discharge, as it had been adjudicated by arbitration that he had not been wrongfully discharged. If the arbitrator had decided in Ivery's favor and ordered his reinstatement, the Postal Service would have been required to reinstate him. It could not claim as did Ivery that the arbitrator had no jurisdiction.

■■ We need not decide whether federal or state law governs the application of the doctrines of res judicata and collateral estoppel in federal tort claims cases. For discussion of this question, *see Johnson v. United States*, 576 F.2d 606 (5th Cir. 1978). Both federal and Michigan law would appear to give estoppel effect to issues actually litigated in an arbitration proceeding between the same parties unless the procedures followed suggest that the arbitration process was unfair and the decision unreliable or unless other policies, statutory or contractual, provide an exception. *See Becton v. Detroit Terminal of Consolidated*, 490 F.Supp. 464 (E.D.Mich.1980); *Senior Accountants, Analysts, Etc. v. City of Detroit*, 399 Mich. 449, 249 N.W.2d 121, 125 (1976); *United States v. Utah Constr. Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1965); *Bower v. Eastern Airlines*, 214 F.2d 623 (3d Cir. 1954); RESTATEMENT (SECOND) OF JUDGMENTS § 132 (Tent. Draft No. 7, 1980); *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) and *Federated Department Stores v. Mortie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981).

In the present case there is no suggestion that the arbitration procedures were unfair or that any statutory or contractual policies

would provide an exception to the general rule favoring the finality of arbitration decisions between the same parties. The decision here was based on a full adversary evidentiary hearing in which plaintiff was represented by counsel. As District Judge Gilmore stated: "There was a clear determination by the arbitrator, a full adversarial hearing. After everyone had ample opportunity to be heard and to present witnesses, the arbitrator found that the plaintiff did steal money from the mails." If this finding is given estoppel effect, plaintiff cannot maintain his federal tort action for malicious prosecution because in order to do so, he must be free to show that he did not take the money from the mails. He must be able to negate probable cause in order to prevail, and he cannot do so if the court accepts the arbitrator's findings.

Since under the doctrine of collateral estoppel the arbitrator's finding is determinative on the issues of theft from the mails in a later civil case between the same parties, the District Court was correct in holding the action barred. We would also observe that even if we reached the merits it would appear that the prosecution in the criminal case was also entitled to rely on the same decision as a basis for establishing probable cause.

Accordingly, the summary judgment of the District Court is affirmed.

NATHANIEL R. JONES, Circuit Judge, concurring.

Notwithstanding the fact that on consideration of Mr. Ivery's defense that he was set up by his employer or its agents, a cross section of the community concluded that reasonable doubt rebutted the government's theory that he was caught red-handed,[1] the earlier arbitrator's decision established the existence of probable cause [2] that Mr. Ivery stole from the mails. As explained by the majority, that determination is both final between the United States and Mr. Ivery, and fatal to the present cause of action by operation of the doctrine of collateral estoppel.

Mr. Ivery challenges the application of collateral estoppel on two fronts. He first argues that the arbitrator had authority to interpret only the labor agreement and not to decide a federal tort suit. However, case law cited with approval by the Supreme Court allows preclusion of relitigation in a civil suit when an arbitral board has determined that a discharge was for cause. See United States v. Utah Construction & Mining Co., 384 U.S. 394, 421 n.18, 86 S.Ct. 1545, 1559 n.18, 16 L.Ed.2d 642 (1966) citing Bower v. Eastern Airlines, Inc., 214 F.2d 623 (3rd Cir. 1954). Since the arbitrator's task in the present case was to determine the cause of Ivery's termination, Bower and similar authorities are dispositive of his first contention.

Mr. Ivery replies that a recent line of Supreme Court precedent distinguishes such authorities as Bower v. Eastern Airlines, Inc., supra, when liability is founded upon a federal statute. See Barrentine v. Arkansas-Best Freight System, 450 U.S. 728, 101

1. I cannot agree with the gratuitous characterization of Mr. Ivery's defense as a "cock and bull story." Ante at 5, However, since the jury verdict may not be construed as a finding in conflict with the probable cause determination, the application of collateral estoppel is not barred by general equitable considerations. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 334, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971); Shimman v. Frank, 625 F.2d 80, 89 (6th Cir. 1980).

2. The Supreme Court of Michigan has defined probable cause as follows:
To constitute probable cause, there must be such reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the person arrested is guilty of the offense charged.
A person may have "probable cause" for making a criminal complaint from information received from others, which he honestly believes to be true, and of such a character, and obtained from such sources, that businessmen generally, of ordinary care, prudence, and discretion, would act upon it under such circumstances, believing it to be reliable.
Gooch v. Wachowiak, 352 Mich. 347, 351–52, 89 N.W.2d 496, 498–99 (1958).

S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *cf. Kremer v. Chemical Construction Corp.*, —— U.S. ——, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (state court affirmance of agency determination).

Mr. Ivery reads these cases too broadly. Both *Barrentine* and *Alexander* rely upon a statute providing "minimum substantive guarantees to individual workers." *Barrentine*, 450 U.S. at 737, 101 S.Ct. at 1443. But beyond a substantive guarantee, both Title VII, 42 U.S.C. § 2000e, *et seq.* (1976), at issue in *Alexander*, and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (1976), at issue in *Barrentine*, evidence an intention to separate the public law right from "majoritarian processes" of collective bargaining. *Id.* at 738, 101 S.Ct. at 1443, quoting *Alexander*, 415 U.S. at 51, 94 S.Ct. at 1021. Overlapping remedies were intended. *Alexander*, 415 U.S. at 47–49, 94 S.Ct. at 1019–20.

The Federal Tort Claims Act does not create a minimum guarantee nor can it be said to be a part of our nation's labor dispute resolution mechanism. The Act was designed to eliminate sovereign immunity. *E.g., United States v. Muniz*, 374 U.S. 150, 152, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805 (1963); *United States Government v. Employees Insurance Co., Inc.*, 612 F.2d 705, 706 (2d Cir. 1980). It creates no new causes of action, rather it accepts liability in circumstances which would render a nongovernmental defendant liable. *Feres v. United States*, 340 U.S. 135, 141, 71 S.Ct. 153, 157, 95 L.Ed. 152 (1950); 28 U.S.C. § 2674 (1976). The Federal Tort Claims Act did not create a separate right from an existing scheme of enforceable duties;[3] and no overlapping remedy was intended: "[T]he primary purpose of the Act was to extend a remedy to those who had been without; if it incidently benefitted those already well

provided for, it appears to have been unintentional." *Id.* at 140, 71 S.Ct. at 156.

Appellant has cited no authority for the conclusion that the exception to collateral estoppel for statutory guarantees invoked in *Barrentine* and *Alexander* is applicable to this Federal Tort Claims Act context. The authorities just reviewed strongly stand against that conclusion. Accordingly, I concur in the judgment.

---

3. The purpose of Congress to replace the cumbersome private bill procedure for victims of governmental wrongdoers, *see, e.g., United States v. Muniz*, 374 U.S. 150, 154, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1963); *Downs v. United States*, 522 F.2d 990, 995 (6th Cir. 1975), is altogether different from the creation of an additional legal remedy. A private bill is an act of legislative grace and in no sense a right of the party to be benefitted thereby. Further, the Federal Tort Claims Act was intended to replace and not to supplement that procedure.