**HYDROGEN TECHNOLOGY CORP.,**
Plaintiff, Appellant,

v.

**UNITED STATES of America,**
Defendant, Appellee.

No. 87–1284.

United States Court of Appeals,
First Circuit.

Argued Sept. 10, 1987.

Decided Oct. 27, 1987.

---

5. Theodor Suess Geisel (a/k/a Dr. Suess), *Yertle the Turtle and Other Stories* (Random House 1958) (emphasis in original).

Norman Jackman with whom Marc A. Comras and Comras & Jackman, P.A., Boston, Mass., were on brief, for plaintiff, appellant.

Martha B. Sosman, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

This appeal arises out of a criminal investigation by the Federal Bureau of Investigation (FBI) into possible wire fraud by one Ambrose J. Hartnett. Hartnett's alleged fraud lay in falsely representing to investors the properties and potential of a hydrogen generating device developed by Hartnett. In the course of its investigation, the FBI obtained a prototype of Hartnett's generator and dismantled it during a laboratory examination procedure. The dismantling process effectively destroyed the device. No criminal prosecution of Hartnett was ever brought. Hartnett's company, Hydrogen Technology Corporation (HTC), subsequently brought a claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–80, alleging that the government acted negligently in destroying the generator. The district court granted summary judgment for the United States and HTC appeals. Because we agree with the district court that the FBI acted with due care in conducting its investigation, we find the government immune under 28 U.S.C. § 2680(a) and affirm.

### I.

The record on appeal consists largely of documents compiled by the FBI in the course of its investigation of Hartnett, including numerous FBI reports on interviews with HTC investors. These documents reveal that in the late 1970's, Ambrose J. Hartnett began promoting to investors a device known as the Hartnett Hydrogen Generator. This generator was repre-

* Of the Third Circuit, sitting by designation.

sented to be a technological breakthrough which could provide an ultra-economical source of energy for home use. According to Hartnett, the core of the generator consisted of a chamber where highly heated water came into contact with what was described as a "catalyst" of metal shavings. As the result of a reaction between the metal shavings and water, hydrogen was produced and could be channeled out of the chamber. Part of the generated hydrogen would be bled out of the generator and used for home heating purposes; the remainder would be fed back into a burner and would in turn heat the reactor core, sustaining the high temperatures necessary for the separation of hydrogen from water. Thus, according to Hartnett, the generator, once initially heated by external sources, would be self-sustaining and would require no further external input other than a small amount of water. Equipped with such a generator, Hartnett claimed, the average home could be heated for about twenty-three cents a month.

At the time Hartnett contacted potential investors, he advised them that the final version of the generator for home use would be completed in less than a year. He also told investors he had interested a French firm, Cruesot Loire Company, in the device, and that the French government had agreed to guarantee all loans and investments in the project up to $100,000,000. According to Hartnett, as soon as the final generator was completed, Cruesot Loire would pay $10,000,000 for worldwide manufacturing rights. Hartnett eventually persuaded a number of people to invest a total of $415,000 in the project. Approximately half of the investors were from the Fort Wayne, Indiana, area; the remainder resided in and around Chatham, Massachusetts, where the generator was being developed.

In return for their payment, investors received a percentage share of the project. Most investors paid $25,000 for a one percent share; others paid as much as $50,000 for the same share while still others received a five percent interest for $25,000. Hartnett also claimed at various times to have invested anywhere from $400,000 to $800,000 of his own money in the genera-

tor. Once the generator was sold to Cruesot Loire, Hartnett told investors, they would receive their share of the royalties from generator sales ($100 on each sale at a base price of $400–700 per unit). Hartnett also told some investors that they would be given managerial positions in the corporation overseeing generator sales, and would receive annual salaries ranging from $80,000 to $85,000.

The investors were sworn to secrecy concerning all aspects of the hydrogen generator project. Hartnett said he was extremely fearful of intervention by the government or oil companies who might want to steal his invention or otherwise prevent him from producing a device in direct competition with petroleum fuels. Because of these security concerns, Hartnett told investors, he had not tried to obtain a patent in the United States. Only after investors had bought into Hartnett's venture were they permitted to visit the Chatham facility and view test firings of experimental generators.

Having been assured that development of the generator would be completed by the beginning of 1980, investors became anxious when in late 1980 and 1981 no final model was forthcoming. Hartnett proffered various excuses for these delays. He explained to some investors that he was encountering difficulty developing a nozzle for the hydrogen burner and in obtaining ceramic material for the generator core. Others were informed that special materials, including silver, nickel, sapphire, and titanium were being incorporated into the reactor chamber in order to withstand the 7000 degree Farenheit temperatures Hartnett claimed were produced. At times Hartnett also referred to special grooves that were being machined into the chamber and which, along with oscillating magnets, created greater turbulence within the reactor and boosted hydrogen production. Some investors were shown a circular tube-shaped device which Hartnett claimed to be a "self-starter" under development. In the self-starter mechanism, a small quantity of hydrogen was allegedly mixed with an unidentified chemical compound; additional

hydrogen and oxygen would be produced and burned off, generating sufficient heat to bring the core up to its operating temperature.

At no point was Hartnett gloomy about the ultimate workability of his generator. Indeed, in 1981, Hartnett told the investors that the prototype generator was working at 140% efficiency, and needed to be tuned down to 100% or else the device might "blow a building down." On the night of January 19, 1982, Hartnett staged a test firing of his final prototype, which he termed a great success. A scientific consultant hired by Hartnett observed the test firing and executed a sworn statement indicating that the generator functioned properly and produced hydrogen. In subsequent interviews with the FBI, however, the consultant said that the core temperature reached only 1600 degrees Farenheit, that the device was not self-sustaining in that it needed periodic refuelings with iron, and that Hartnett's generator could only be used for industrial, not home heating, purposes. In spite of Hartnett's glowing predictions, the Hartnett Hydrogen Generator has never been produced commercially nor have manufacturing rights been sold to Cruesot Loire or any other entity.

Upon learning of Hartnett's promotional activities, the Fort Wayne, Indiana, FBI office in January of 1981 initiated an investigation into possible violations of the federal wire fraud statute, 18 U.S.C. § 1343. FBI investigators interviewed both Hartnett and the investors in his venture. Through the French police, the FBI also contacted Cruesot Loire Company and Francois Mayer, Hartnett's alleged business associate there. Mr. Mayer indicated that, contrary to Hartnett's claims, he had only spoken briefly with Hartnett on a technical matter related to the generator, and had never discussed financing or marketing the generator, let alone expressed an interest in purchasing rights to the device.

To evaluate the technological feasibility of the Hartnett Hydrogen Generator, the FBI contacted Dr. Fred Gornick, a Professor at the University of Maryland, who was affiliated with the United States Department of Energy and had a special background in the chemistry of hydrogen energy. Gornick informed the FBI that, while the production of hydrogen from iron and water is a well-known chemical reaction, many of Hartnett's claims were incredible. According to Gornick, no known substance can withstand temperatures of 7000 degrees Farenheit, so that even if the generator could produce such temperatures, it would simply melt. Hartnett's claim that his generator was self-sustaining made it, according to Gornick, a perpetual motion machine, in violation of the First Law of Thermodynamics. Overall, Gornick described the purported design, materials, cost, and output of the generator as "both inconsistent and ridiculous."

The FBI forwarded the results of its investigation to the United States Attorney's Office in Fort Wayne, but that office declined to prosecute Hartnett. In an April 1983 letter to the FBI, the Assistant United States Attorney in charge of the Hartnett case cited a number of factors mitigating against prosecution. First, the prosecutor thought there was insufficient credible and admissible evidence to prove that Hartnett had defrauded investors. Second, there were currently ongoing civil lawsuits between investors and Hartnett in Indiana and Massachusetts. Through these lawsuits, the return of investors' money might be effected. Third, many of the investors in the generator were reluctant to come forward and admit that they had been duped by Hartnett. Indeed, some still believed that the generator might prove to be a viable energy producer. Finally, Hartnett was nearly seventy-five years old and in poor health. Following the declination of prosecution, the FBI in June of 1983 placed the Hartnett matter on "pending inactive status."

While the FBI was investigating Hartnett, dissatisfied investors were taking some steps of their own. When in March of 1982 Hartnett failed to carry through on a promised demonstration of the generator, the investors as a group agreed to permit one of them, Howard Scherer, to take the unit to Purdue University for testing. But

Scherer did not deliver the unit to Purdue; instead he kept it, while trying to establish in United States District Court in Indiana that he was, in effect, the sole owner. Scherer did not succeed in court and, in spite of an order that he turn the generator over to the other investors, held on to the unit. Eventually, in the fall of 1983, after Scherer had fled Indiana, another Indiana HTC investor who knew the whereabouts of the generator voluntarily turned it over to the FBI Indianapolis office.

Seizing on its first opportunity to actually examine the Hartnett Hydrogen Generator, the FBI sent the unit to the FBI laboratory in Washington for testing. In its request for examination, the Indianapolis office stated that it wanted to know not only *if* the generator could produce hydrogen, but *how* it operated and whether it could serve as a cost-effective source of home energy. The request also stated a number of the claims made by Hartnett, including that the generator was self-sustaining, that core temperatures reached 7000 degrees Farenheit, and that the unit contained sapphire and gold linings, and asked the lab to evaluate whether they were true.

The lab examination was conducted by Dr. Fred Gornick, the same chemist who had earlier provided advice to the FBI on the scientific feasibility of some of Hartnett's claims. At no point in his examination did Gornick fire up the generator to try to produce hydrogen. Rather, assuming that the device could produce some hydrogen so long as it combined heated water and iron, Gornick dismantled it in order to see how it was constructed and whether it could live up to Hartnett's many claims. Inside the generator's thick steel shell, Gornick found a three-inch layer of conventional asbestos insulation surrounding a steel core. The reactor chamber itself was intricately machined, but contained no exotic materials, only two cubic feet of iron filings. As claimed by Hartnett, the core did have a device for bleeding off hydrogen to a burner which could in turn heat the reactor chamber. There was, however, no self-starter and the initial heating of the unit was accomplished by a common 110 volt electric heater.

Gornick determined that the generator could have produced hydrogen, but described it as an "elaborately constructed device for carrying out a simple well known chemical reaction which could be performed about as well or better in a heated pipe full of iron briquets." The generator was not self-sustaining, Gornick said, because iron was in no sense a "catalyst," but rather a reactant which would become spent and have to be replaced frequently.[1] Indeed, according to Gornick's calculations, even assuming complete conversion of iron and total efficiency, the generator would require nine tons of iron filings in order to provide enough energy for a single home for a year.[2]

Following the FBI laboratory examination, the dismantled and now unusable prototype generator was returned to the Massachusetts HTC investors in February of 1984. No indictments or prosecutions were brought and on September 19, 1984, the FBI closed its investigation. In accordance with the procedural requirements of the FTCA, 28 U.S.C. § 2675(a), HTC presented its claim for $50,600,000 in damages to the FBI in November of 1984. When the FBI failed to act on the claim, HTC instituted this lawsuit.

The government claimed immunity under three provisions of 28 U.S.C. § 2680: first, because the FBI acted with due care in carrying out its investigation, it was protected under the first part of section

---

**1.** A catalyst is a substance that causes or accelerates a chemical reaction between other substances without itself being affected. Webster's Third New International Dictionary 350 (1971).

**2.** Gornick's report did note that the generator might have been made part of a cycle for *industrial* hydrogen production, if it were used in conjunction with a blast furnace for restoring the spent iron. The Hartnett Hydrogen Generator contained no such restoring mechanism, however, and at any rate had always been promoted as a source of home energy, not industrial hydrogen production.

2680(a);[3] second, the FBI's decision to dismantle was a discretionary act which rendered the FBI immune from liability under the second part of section 2680(a); third, the FBI's laboratory examination fell within section 2680(c) as a protected detention of goods by a customs, excise or "other law enforcement officer."[4]

On a stipulated record, the district court considered cross-motions for summary judgment on the issue of governmental immunity. In an opinion now reported at 656 F.Supp. 1126 (D.Mass.1987), the court found section 2680(c) inapplicable, since the examination was conducted by the FBI and was unrelated to any customs or excise function. Nevertheless, the court granted summary judgment for the government because it found that the FBI acted with due care within section 2680(a). HTC seeks to have that ruling overturned.

## II.

The Federal Tort Claims Act constitutes a limited waiver of sovereign immunity for certain negligent or wrongful acts by government employees acting within the scope of their employment. Congress passed the Act out of a growing recognition that the government owed an obligation to pay damages for the harm caused by its employees' misfeasance, and out of frustration with the prior private bill remedy. *Dalehite v. United States,* 346 U.S. 15, 24–25, 73 S.Ct. 956, 962, 97 L.Ed. 1427 (1953); *D'Ambra v. United States,* 481 F.2d 14, 16–17 (1st Cir.), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482

(1973). The prerequisite for liability under the Act is a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *see Zabala Clemente v. United States,* 567 F.2d 1140, 1143 (1st Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

There are, however, many exceptions to the FTCA, *see* 28 U.S.C. § 2680, two of the most prominent of which are discretionary government acts, even if undertaken negligently, 28 U.S.C. § 2680(a); *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), and acts where there is no negligence, even if an individual would have been liable without fault. 28 U.S.C. § 2680(a); *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). *See D'Ambra,* 481 F.2d at 17. Here, the first and most fundamental obstacle faced by appellant is the government's assertion that it is immune because the FBI conducted its investigation with due care.[5] Because the "application of the FTCA is a federal question," *D'Ambra,* 481 F.2d at 18, we must look initially to federal law to determine whether an exception to the FTCA applies.

HTC asserted in district court that Massachusetts law ought to govern the question of due care since the investors

---

**3.** 28 U.S.C. § 2680(a) provides that:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

**4.** 28 U.S.C. § 2680(c) provides that:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

. . . .

(c) Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of goods by any officer of customs or excise or any other law enforcement officer.

**5.** Section 2680(a) refers to "due care ... in the *execution of a statute or regulation.*" 28 U.S.C. § 2680(a) (emphasis added). As the district court correctly noted, the FBI has a duty under 28 U.S.C. § 533 "to detect and prosecute crimes against the United States." Appellant has not contested that the FBI was acting pursuant to its statutory duties in this case, but has limited its claim to the FBI's alleged lack of due care.

and plaintiff corporation are residents of Massachusetts and because the impact of the alleged negligence would be felt in Massachusetts. Apparently seeking to comply with 28 U.S.C. § 1346(b), HTC argued that at any rate the law of the District of Columbia (where the allegedly negligent acts occurred) was substantially similar. Because the government did not contest the point, the district court assumed that Massachusetts law applied or that, if District of Columbia law applied, it was not substantially different.

The district court's decision to use state law in applying the section 2680(a) exception was mistaken because it misperceived the structure of the FTCA. The waiver of sovereign immunity for federal tort claims is a purely statutory one and extends only so far as Congress intended it. Since the exceptions set out in section 2680 define the limits of that statutory waiver, they must be construed as a matter of federal, not state, law. *See United States v. Neustadt,* 366 U.S. 696, 705–06, 81 S.Ct. 1294, 1299–1300, 6 L.Ed.2d 614 (1961) (determining that federal, not state, law governs whether a claim for negligent misrepresentation is excluded by § 2680(h)); *Jimenez–Nieves v. United States,* 682 F.2d 1, 3–4 (1st Cir.1982) (citing *Neustadt*); 1 L. Jayson, *Handling Federal Tort Claims* § 241 (1987). Indeed, because 28 U.S.C. § 1346(b) provides that federal courts shall have jurisdiction over FTCA claims *"subject to,"* inter alia, section 2680, the exceptions found in that section define the limits of federal subject matter jurisdiction in this area. *See Dalehite v. United States,* 346 U.S. 15, 24, 73 S.Ct. 956, 962, 97 L.Ed. 1427 (1953) (where discretionary function exception of section 2680(a) applies, district court had no jurisdiction over cause of action); 1 L. Jayson, *supra,* at § 193.03. Permitting state law to control the breadth of the exceptions to the FTCA would mean that federal subject matter jurisdiction might vary from case to case depending on particular state choice of law rules for torts; this would be unacceptable.

In a case like this, where the substantive claim sounds in state negligence law and where federal law is probably similar, we understand that there is a temptation to use state law in applying the due care exception of section 2680(a). Nevertheless, the appropriate course is to use a federal standard. Only if section 2680(a) immunity is found lacking should state negligence law be considered under the guise of section 1346(b).

In applying the federal standard for due care under 28 U.S.C. § 2680(a), "we refer, as did the Supreme Court in *Neustadt,* to the Restatement (Second) of Torts, and to federal cases construing the exception." *Jimenez–Nieves,* 682 F.2d at 4 (construing the § 2680(h) exception). The relevant question is one of reasonableness. Restatement (Second) of Torts § 282 (1965) ("negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm"). The district court followed the wrong law, but arrived at the correct test: "considering the status of defendant (law enforcement agency) and that of plaintiff (subject of investigation) what would the reasonable law enforcement agency have done under the circumstances?" We pay particular attention to the reasonableness calculus proposed by Restatement (Second) of Torts (1965) which requires the FBI to have employed reasonable knowledge of human qualities and of the law, *id.* at § 290, and to have recognized and considered the risk to HTC in carrying out its laboratory examination. *Id.* at § 289. Negligence is determined by balancing the magnitude of that risk against the potential public utility of the FBI's examination of the generator. *Id.* at § 291–93.

■ The government argues, and the district court below found, that a reasonable law enforcement agency, under the circumstances existing in late 1983, would have subjected the Hartnett Hydrogen Generator to laboratory scrutiny, even if it meant dismantling the device and effectively destroying it. HTC claims that, to the contrary, the only reasonable course would have been a test firing; under no circumstances, HTC says, should the FBI have dismembered the only existing prototype of the generator. HTC marshals a number of

arguments on its behalf, none of which we find persuasive.[6]

■ First, HTC relies heavily on the fact that the United States Attorney's Office declined prosecution of Hartnett *before* the FBI's renewed investigation led to the destructive examination of the generator. Clearly, the fact that a prosecutor in April of 1983 decided against pursuing criminal charges has some logical bearing on the reasonableness of the FBI's decision in late 1983 and 1984 to continue its investigation. But that is not the question before this court. HTC has stated, implicitly in its brief and explicitly in oral argument, that it is not challenging the FBI's decision to continue investigating Hartnett after prosecution was declined nor is it challenging the FBI's general decision to test the generator in some way, decisions which HTC acknowledges are discretionary functions immunized by 28 U.S.C. § 2680(a). Rather, HTC's negligence claim is limited to the FBI's selection of a destructive examination procedure as opposed to a simple test firing, once the decision to examine the generator in some way had been made. For purposes of selecting a testing *method,* however, the declination of prosecution is simply irrelevant. Whether or not a prosecution was pending, the FBI, having decided to examine the generator, would need to do so in the way best calculated to reveal information which would determine whether Hartnett had made fraudulent

claims. And the FBI's need for such information would in no way be lessened by the fact that the government had declined prosecution.[7]

Second, HTC argues that test firing the generator offered to the FBI a better suited examination procedure which would have revealed all the information necessary about the capabilities of Hartnett's generator. Relying on *Downs v. United States,* 522 F.2d 990 (6th Cir.1975), HTC claims that the FBI's decision to ignore this alternative and select a more intrusive form of testing constitutes actionable negligence. In *Downs,* the question was whether the government could be held liable when FBI agents at the scene of a hijacking incident refused to negotiate with the hijackers and instead fired upon the plane, prompting one of the hijackers to shoot two hostages. After first holding that the FBI's action was not immunized under 28 U.S.C. § 2680(a) as a discretionary function, the Sixth Circuit went on to find the "due care" exemption of section 2680(a) equally inapplicable. The court reasoned that the FBI had a "better-suited alternative," namely, playing a "waiting game" with the hijackers, and thus found that the FBI had acted negligently under Florida tort law. 522 F.2d at 1002. The court also emphasized that the FBI agents had violated FBI policy and disregarded the substance of FBI handbook guidelines in handling the incident. *Id.*

---

**6.** HTC also suggested at oral argument that it is the government's burden to show that a particular exception to the FTCA applies, and we recognize that some courts seem to have adopted this approach. *E.g., Carlyle v. United States,* 674 F.2d 554, 556 (6th Cir.1982) ("after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by § 2680," the burden to prove applicability of specific provision falls on the government). As we have discussed above, however, when an exception to the FTCA applies, sovereign immunity is still intact and federal courts have no subject matter jurisdiction to entertain an action. It is well-established law that such jurisdictional defenses cannot be waived by the parties and may be raised for the first time on appeal or even raised by a court sua sponte. *United States v. U.S. Fidelity & Guaranty Co.,* 309 U.S. 506, 513–14, 60 S.Ct. 653, 656–57, 84 L.Ed. 894 (1940); *Eisler v. Stritzler,* 535 F.2d 148, 151 (1st Cir.1976); *Leonhard v. United*

*States,* 633 F.2d 599, 618 n. 27 (2d Cir.1980) ("It is immaterial that the defense of sovereign immunity was not expressly raised by the agencies below nor pressed by them on this appeal. Since sovereign immunity is a jurisdictional defect, it can be raised at any time, and indeed by a court of appeals on its own motion.") (citations omitted), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). *See also* 1 L. Jayson, *Handling Federal Tort Claims* § 193.03 (1987); 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1393 (1969 & Supp.1987).

**7.** Indeed, as noted above, the declination of prosecution was based, in part, on insufficient admissible evidence. A reasonable FBI agent might thus logically have concluded that, in light of the declination, an especially comprehensive examination was necessary in order to unearth all available evidence that might lead to prosecution.

While we agree with the Sixth Circuit that an analysis of "better-suited alternatives" is a useful tool for evaluating negligence, we note at the outset that this case is clearly distinguishable from *Downs* in that there has been no allegation that any FBI guideline was violated.[8] Further, we are not convinced that test firing would have provided a viable alternative. Even if carried out over a prolonged period and carefully monitored, a test firing at best would have revealed whether the generator could produce hydrogen and whether it was self-sustaining for the test period. But, contrary to HTC's assertions, those were not the only questions confronting the FBI. Indeed, according to the FBI's expert, the production of hydrogen from hot water and iron is a relatively simple procedure which can be accomplished without any elaborate mechanism. The real issue to be resolved by the FBI laboratory examination was whether Hartnett's generator was such a simple device or whether, as Hartnett claimed, it was a technological breakthrough composed of exotic materials and intricate machining.[9] Prior to opening up the generator, the FBI could not even have calculated the efficiency of Hartnett's invention—another critical issue—because they did not know how much iron it contained, nor whether it contained any other fueling agents. Perhaps the FBI should have test fired the generator before dismantling it, but the record belies the assertion that test firing would have been an adequate *alternative*.

HTC's third argument is that the FBI acted negligently in dismantling the generator because in so doing they destroyed its evidentiary value. Essentially, HTC argues that a test firing of the generator would have been a crucial part of the defense were Hartnett ever to have been prosecuted. Citing cases like *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), HTC claims that the government's failure to preserve intact this demonstrative evidence constitutes actionable negligence.[10] Like HTC's second argument, however, this claim is premised on the notion that the only issue confronting the FBI was whether the generator could produce hydrogen gas. As we have already stated, our review of the record indicates that, to the contrary, the real issues involved were how the generator was constructed and of what it was made. It goes without saying, then, that a dismantling of the generator was a reasonable, even necessary, element of the investigation. Further, such a dismantling would not and did not necessarily destroy the exculpatory value of the physical evidence. To the extent the defense might have wanted to show that the generator could produce hydrogen, the government's own report concedes that it could have, and the defense would have been free to have the dismantled generator examined by its own experts. And if the defense wanted to show how the generator was constructed, the physical evidence was still intact after the examination and available for presentation in court.

While we are mindful of the potential danger to individual rights when an investigating arm of the government seizes and dismantles private property in the course of an ultimately fruitless endeavor, we are

---

8. As noted above, we also disagree with the *Downs* court to the extent state negligence law and not federal law was used to determine the applicability of the § 2680(a) exception.

9. The Indianapolis FBI's request for examination reads in part:

   The defense might state that investors were told this item produces hydrogen gas, which it may, and that this hydrogen gas can be used to heat your house, which it may; however, the real question is did they invest $25,000 and $50,000 into a simply [sic] hydrogen gas production device deliberately made elaborate

and complicated as a rouse [sic] to secure their investment.

10. Additionally, HTC urges in its brief that the government's actions in destroying allegedly exculpatory evidence "violated fundamental Due Process requirements." Since no criminal case has been brought and Hartnett is not a party to this case, it is not clear whose constitutional rights have allegedly been violated or how they have been violated. At any rate, appellant's constitutional argument was not raised in the district court and is not properly before us now. *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979).

unable to find anything in the record which indicates that the FBI acted other than with due care. Following the Restatement balancing approach, we find that, because the fraud allegations against Hartnett turned largely on how the generator was constructed, the potential utility in dismantling it was high. Moreover, if the generator were really the technological breakthrough that it was claimed to be, HTC, having already developed a design, could easily have built a new prototype generator. Thus the risk of permanent harm was low. The inescapable conclusion is that the FBI did not act negligently and that the government is immune under 28 U.S.C. § 2680(a).

The normal rule is that issues of negligence are not to be resolved by summary judgment. 6–Pt.2 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.17[42], at 56–946 (1987); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2729, at 194 (2d ed. 1983). This rule is premised on the fact that negligence and reasonableness are particularly elusive concepts, and that parties therefore should not be deprived of an opportunity to put all their evidence before a jury for factual evaluation. *See, e.g., Gauck v. Meleski,* 346 F.2d 433, 437 (5th Cir.1965). Here, however, as the district court found, 656 F.Supp. at 1126, the parties have agreed that there is no dispute over material facts. Indeed, appellant has asserted that, even if summary judgment for the government was reversed, the only additional evidence it would seek to introduce is on the issue of damages. And, appellant has no right to a jury trial. *See* 28 U.S.C. § 2402. Even if this case came on for a full trial, then, the same decisionmaker would determine the same issue of negligence on the same evidence. We think that the district court's summary adjudication in this case was thus proper. *See Taylor v. Gallagher,* 737 F.2d 134, 137 (1st Cir.1984) ("Summary judgment is inappropriate in negligence actions only if genuine issues of material fact exist or if reasonable jurors could draw different inferences from agreed facts."); *Dobb v. Baker,* 505 F.2d 1041, 1043–44 (1st Cir. 1974) (upholding summary judgment for defendant where "there was nothing to support a finding of negligence").

Because we find that the due care exception to the FTCA applies, it is unnecessary to reach the other claims of statutory and common law immunity raised by the government.

*Affirmed.*

Costs awarded to appellee.