REVISED MARCH 11, 2009
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 22, 2009

Charles R. Fulbruge III
Clerk

No. 07-31066

HERBERT FREEMAN, JR, Individually and in his capacity as representative of the estate of Ethel Freeman

Plaintiff - Appellant

v.

UNITED STATES OF AMERICA

Defendant - Appellee

BARBARA ELEBY LEE; BRENDA BISSANT; GLENDA ELEBY; GRIFFIN ELEBY, JR; ROSALIE BROOKS; DOROTHY BEAL; EARLINE COLEMAN; ETHEL JACKSON; NANCY ELEBY

Plaintiffs - Appellants

v.

UNITED STATES OF AMERICA

Defendant - Appellee

FRANCES LODRIGUSS

Plaintiff - Appellant

v.

UNITED STATES OF AMERICA

Defendant - Appellee

No. 07-31066

BARBARA ELEBY LEE; BRENDA BISSANT; GLENDA ELEBY; GRIFFIN ELEBY, JR; ROSALIE BROOKS; DOROTHY BEAL; RODNEY JACKSON, for the Estate of Ethel Jackson; NANCY ELEBY

                                                    Plaintiff - Appellants

v.

UNITED STATES OF AMERICA

                                                    Defendant - Appellee

_____

Appeal from the United States District Court
for the Eastern District of Louisiana, New Orleans
Nos. 2:06-CV-4846, 06-CV-5689, 06-CV-5696,
O7-CV-2243, O7-CV-2244, 07-CV-2245

_____

Before KING, DEMOSS, and PRADO, Circuit Judges.

KING, Circuit Judge:

We are asked whether the discretionary function exception of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5148, bars a suit based on the federal government's handling of relief efforts in the aftermath of Hurricane Katrina. Plaintiffs allege that the federal government's violations of various provisions of the National Response Plan render the United States liable under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680, for the deaths of Ethel Freeman, John J. DeLuca, and Clementine Eleby. The district court held that the conduct at issue was vested in the government's discretion. It therefore dismissed plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the United States had not waived sovereign immunity for its discretionary acts. We affirm.

2

## I. FACTUAL, PROCEDURAL, AND REGULATORY BACKGROUND

### A. Factual and Regulatory Background

Plaintiffs are the relatives or representatives of Ethel Freeman, John J. DeLuca, and Clementine Eleby ("decedents"). Because of impaired mobility, decedents stayed in New Orleans when Hurricane Katrina made landfall near the city on August 29, 2005. After three distinct travails, Ms. Freeman, Mr. DeLuca, and Ms. Eleby died in the subsequent days. The nation witnessed these tragedies unfold many times over.

Ms. Freeman died on Wednesday, September 1, 2005, at the New Orleans Convention Center. She was chronically ill and decided to stay in her home when Hurricane Katrina came ashore. After waters from Lake Pontchartrain breached the Industrial Canal, 17th Street flood walls, and London Avenue flood walls, water flooded her home to a depth of several feet. On August 31, 2005, Ms. Freeman's son, Herbert Freeman, Jr. ("Herbert"), borrowed a boat from a friend, placed Ms. Freeman in her wheelchair, and then moved her into the boat. Herbert then shuttled Ms. Freeman to higher ground. Once the Freemans reached dry land, New Orleans police officers directed them to the Convention Center. At the Convention Center, Herbert notified police officers that Ms. Freeman needed medical attention. The officers told him a bus would come to evacuate Ms. Freeman. Squalid conditions existed at the Convention Center, and it was not equipped with food, water, medical assistance, triage, or transportation. Ms. Freeman died the day after she arrived there. An image of her blanket-covered body was broadcast on national television.

Ms. Eleby also died at the Convention Center on September 1, 2005. Because she was bedridden, a physician advised her to evacuate to a local hospital as the hurricane approached. Ms. Eleby's caretaker, Barbara Eleby Lee, contacted officials to inquire about taking Ms. Eleby to the Superdome, but she was informed that no beds would be provided. There was also a dearth of

available beds at local hospitals. As a result, Ms. Eleby stayed at her residence with Barbara Eleby Lee and other members of her family. The storm trapped them in their home. On August 30, 2005, first responders arrived by boat. Rescuers in the first boat to approach offered to take Ms. Eleby's family if they left her behind; the potential rescuers did not want to take her because she was paralyzed and bedridden. Her family refused, and when a second boat approached, they placed her in it first. That boat delivered them to Chef Menteur Highway, where they spent the night without food, water, shelter, or medical care. The next day, Ms. Eleby's family carried her to an interstate highway, where rescuers in a large truck picked them up and transported them to the Convention Center. At the Convention Center, Ms. Eleby experienced the same squalid conditions as did Ms. Freeman. As noted above, the Convention Center was not equipped with food, water, medical assistance, triage, or transportation. Ms. Eleby died at the Convention Center the following day.

Mr. DeLuca died at Louis Armstrong International Airport on September 3, 2005. Before the storm, Mr. DeLuca resided in the Nazareth Inn, an independent and assisted living facility in eastern New Orleans. After Hurricane Katrina came ashore, flood waters surrounded and flooded the facility. A helicopter crew rescued Mr. DeLuca and delivered him to the Pontchartrain Center in Kenner, Louisiana. When the Pontchartrain Center also flooded, another helicopter transferred him to the interchange of Interstate 10 and Causeway Boulevard (the "Cloverleaf"). He arrived there on August 30, 2005. The Cloverleaf was not equipped with food, water, shelter, medical assistance, triage, or transportation. Although evacuation buses began to arrive on August 31, 2005, Mr. DeLuca was not evacuated. Still on the Cloverleaf on September 2, 2005, Mr. DeLuca collapsed from stress, heat exhaustion, hunger, and dehydration. A helicopter airlifted him to the airport. Mr. DeLuca died there the next day.

Plaintiffs in this case allege that the federal government caused or contributed to these deaths by negligently failing to perform nondiscretionary duties arising under the National Response Plan (the "NRP").[1] Pursuant to authority granted in part by the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121–5208, the President directed the Secretary of the Department of Homeland Security ("DHS") to develop the NRP. See Homeland Security Presidential Directive/HSPD-5, 2003 WL 604606, at *1 (Feb. 28, 2003). The directive tasked DHS with promulgating the NRP in order to "integrate Federal Government domestic prevention, preparedness, response, and recovery plans into one all-discipline, all hazards plan" and "provide the structure and mechanisms for national level policy and operational direction for Federal support to State and local incident managers and for exercising direct Federal authorities and responsibilities." Id. at *4.

DHS Secretary Michael Chertoff released the NRP in December 2004. The NRP "establishe[d] a single, comprehensive framework for the management of domestic incidents." Dep't of Homeland Sec., Nat'l Response Plan iii (2004). It was organized into a Base Plan supplemented by annexes categorized into three groups: Emergency Support Function ("ESF") (corresponding to types of operational responses); Support (corresponding to organizational activities); and Incident (corresponding to types of emergencies that require "specialized, incident-specific implementation"). Id. at xii.

The Catastrophic Incident Annex (the "Annex"), a Support annex, contained the provisions of the NRP at issue in this case. The Annex was "applicable for all hazards." Id. at INC-i. It "establishe[d] the context and overarching strategy for implementing and coordinating an accelerated,

---

[1] After the events at issue in this case, DHS replaced the NRP with the National Response Framework. Because the NRP in effect at the time of Hurricane Katrina is no longer available on the government's web sites, we cite the record version.

proactive national response to a catastrophic incident," defined as "any natural or manmade incident, including terrorism, that results in extraordinary levels of mass casualties, damage, or disruption severely affecting the population, infrastructure, environment, economy, national morale, and/or government functions." Id. at CAT-1. The Annex also noted that "[a] more detailed and operationally specific NRP Catastrophic Incident Supplement (NRP-CIS) that is designated 'For Official Use Only' will be approved and published independently of the NRP Base Plan and annexes." Id. at CAT-1; see also id. at CAT-5. The Base Plan required the DHS Secretary to "[i]dentify appropriate assets and establish agreements and procedures for their rapid deployment and employment in accordance with the NRP Catastrophic Incident Supplement" within 120 days of issuance of the NRP. Id. at ix. Plaintiffs allege that Secretary Chertoff completed this task on September 6, 2005.

The Annex described certain situational difficulties that arise in catastrophic incidents. For example, during catastrophes, "[t]here is a significant need for public health and medical support, including mental health services." Id. at CAT-2. Therefore, "[m]edical support is required not only at medical facilities, but at casualty evacuation points, evacuee and refugee points and shelters, and at other locations to support field operations." Id. The Annex similarly documented "Planning Assumptions." One such assumption stated: "Federal support must be provided in a timely manner to save lives, prevent human suffering, and mitigate severe damage. This may require mobilizing and deploying assets before they are requested via normal NRP protocols." Id. at CAT-3. The Annex also listed as a "guiding principle" that "[n]otification and full coordination with States occur, but the coordination process should not delay or impede the rapid mobilization and deployment of critical Federal resources." Id. at CAT-4.

Within that context, the Annex enumerated tasks that the government was to undertake in a catastrophic incident. For example: "Incident-specific resources and capabilities (e.g., medical teams, search and rescue teams, equipment, transportable shelters, preventive and therapeutic pharmaceutical caches, etc.) are activated and prepare for deployment to a Federal mobilization center or staging area near the incident site." Id. DHS, in particular, assumed certain responsibilities once NRP processes were implemented,[2] while other agencies were to undertake relevant emergency support functions.[3] The NRP and, specifically, the Annex thus formed the backbone of the federal government's response to catastrophic incidents like hurricanes.[4]

---

[2] DHS was to:
      Activate and deploy (or prepare to deploy) DHS-managed teams, equipment caches, and other resources in accordance with the NRP-CIS;
      Identify, prepare, and operationalize facilities critical to supporting the movement and reception of deploying Federal resources;
      Activate national-level facilities and capabilities in accordance with the NRP-CIS and standard NRP protocols;
      Establish and maintain communications with incident command authorities to ensure a common and current operating picture regarding critical resource requirements. As specific resource requirements are identified, advise the Department of Transportation to reprioritize and adjust accordingly the schedule of execution for resource flow in the NRP-CIS; and
      Make every attempt to establish contact with the impacted State(s) to coordinate the employment of Federal resources in support of the State.
Id. at CAT-5.

[3] Other agencies also assumed responsibilities:
      Activate and deploy (or prepare to deploy) agency- or ESF-managed teams, equipment caches, and other resources in accordance with the NRP-CIS;
      Commence ESF responsibilities as appropriate;
      Commence assessments of the probable consequences of the incident and projected resource requirements; and
      Commence development of shorter and longer term response and recovery strategies.
Id. at CAT-5–CAT-6.

[4] The NRP operated in conjunction with regulations promulgated pursuant to the Stafford Act. Those regulations provide that the Federal Emergency Management Agency ("FEMA") may issue mission assignments to other government agencies during a declared disaster. Section 206.2(a)(18) of the Code of Federal Regulations defines a mission assignment

As we all witnessed and as has been amply documented in the reports of various congressional committees, despite the existence of the NRP and other Stafford Act regulations, the federal government was unprepared for Hurricane Katrina, and its response was universally criticized as inadequate, unorganized, and flawed. See generally, e.g., H.R. Rep. No. 109-377 (2006); S. Rep. No. 109-322 (2006). Among the many shortcomings, FEMA officials displayed a lack of situational awareness that led to organizational inaction, and critical elements of the NRP were executed late, ineffectively, or not at all. See H.R. Rep. No. 109-377, at 2–5. More specifically, the record reveals that federal agencies did not initiate decisive action to assist evacuees at the Convention Center until September 2, 2005, and contains no evidence of any mission to aid evacuees at the Cloverleaf.

B.    Procedural Background

Plaintiffs filed their first series of complaints in 2006 (the "2006 complaints"). They alleged claims against the United States, various federal

---

as a "[w]ork order issued to a Federal agency by [FEMA's] Regional Director, Associate Director, or Director, directing completion by that agency of a specified task and citing funding, other managerial controls, and guidance." 44 C.F.R. § 206.2(a)(18); see also 44 C.F.R. § 206.7 ("All directives, known as mission assignments, to other Federal agencies shall be in writing, or shall be confirmed in writing if made orally, and shall identify the specific task to be performed and the requirements or criteria to be followed."). Thus, certain specified FEMA officials may use mission assignments to "direct any Federal agency to utilize its authorities and the resources granted to it under Federal law . . . to support emergency efforts by State and local governments to save lives; protect property, public health and safety; and lessen or avert the threat of a catastrophe," or to "direct any Federal agency to provide emergency assistance necessary to save lives and to protect property, public health, and safety by: [e.g.,] . . . [d]istributing medicine, food, and other consumable supplies." 44 C.F.R. § 206.5. FEMA uses mission assignments to allocate resources, coordinate agency tasks, and ensure reimbursement for expenses. See Dep't of Homeland Sec., Nat'l Response Plan at ESF #5-2. When an agency is tasked through a mission assignment, however, it may ask another agency to provide support for a sub-task, see id. at FIN-4, or may issue a "mission assignment task order," which is a "specific instruction given to a Federal agency under a mission assignment directing it to perform work of certain quantity or in a certain area under that mission assignment," see Fed. Emergency Mgmt. Agency, Recovery Policy 9523.9: 100% Funding for Direct Federal Assistance and Grant Assistance, at VII(A)(2) (June 9, 2006).

agencies, and certain federal officers in their individual and official capacities. Herbert brought suit alleging wrongful death and survival actions against the United States, DHS, and Secretary Chertoff for Ms. Freeman's death. He amended his complaint to name Secretary Chertoff, Secretary of Health and Human Services Michael Leavitt, and Secretary of Defense Donald Rumsfeld in their individual and official capacities. Barbara Lee, Brenda Bissant, Glenda Eleby, Griffin Eleby, Jr., Rosalie Brooks, Dorothy Beal, Earline Coleman, Ethel Jackson, and Nancy Eleby filed a complaint alleging wrongful death and survival actions against the United States and Secretary Chertoff, Secretary Leavitt, Secretary Rumsfeld, and FEMA Director Michael Brown, in their individual and official capacities for Ms. Eleby's death. Finally, Frances Lodriguss brought suit alleging wrongful death and survival actions against the United States, and Secretary Chertoff, Secretary Leavitt, Secretary Rumsfeld, and Director Brown, in their individual and official capacities, for Mr. DeLuca's death. The district court consolidated the three cases.

Plaintiffs brought their claims under the Stafford Act, 42 U.S.C. §§ 5121–5208, for failure to properly follow the NRP. Additionally, Herbert claimed that defendants' actions gave rise to liability under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–2680. Defendants responded by filing a motion to dismiss the claims against the United States, the federal agencies, and all individuals in their official capacities for lack of subject matter jurisdiction. Citing both the discretionary function exception of the Stafford Act, 42 U.S.C. § 5148, and the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a), the government argued that the United States has not waived its sovereign immunity for discretionary conduct and that the NRP did not create any nondiscretionary duties.[5] Plaintiffs responded to the motion by

---

[5] The government also argued that plaintiffs, with the exception of Mr. Freeman, had not exhausted their administrative remedies.

arguing that: (1) it was premature because they were entitled to discovery to determine whether defendants breached non-discretionary duties; and (2) defendants violated non-discretionary NRP directives in the provision of disaster relief assistance.

On April 24, 2007, while the motion to dismiss was pending, plaintiffs filed a new round of complaints (the "2007 complaints"). The 2007 complaints raised similar facts as the 2006 complaints. The 2007 complaints, however, alleged tort claims under the FTCA only against the United States and claimed exhaustion of available administrative remedies.

Less than a week later, the district court granted defendants' motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction on the grounds of sovereign immunity. The court, assuming that the Stafford Act provided a limited waiver of sovereign immunity, concluded that the Stafford Act's discretionary function exception, § 5148, should be analyzed in the same manner as the FTCA's discretionary function exception, § 2680(a); therefore, it applied the United States Supreme Court's two-part test for determining the applicability of the FTCA's discretionary function exception, see United States v. Gaubert, 499 U.S. 315, 322–23 (1991); Berkovitz v. United States, 486 U.S. 531, 536–37 (1988). The district court concluded that the first prong was satisfied because plaintiffs "point[ed] to no specific, mandatory directive found within the statutory scheme of the Stafford Act or its accompanying federal regulations that [d]efendants are alleged to have ignored in the aftermath of Hurricane Katrina." See Freeman v. U.S. Dep't of Homeland Sec., Nos. 06-4846, 06-5689 & 06-5696, 2007 WL 1296206, *6 (E.D. La. Apr. 30, 2007) (emphasis in original). The district court rejected plaintiffs' attempt to rely on the NRP as the basis for the mandatory directives because "the NRP does not prescribe a specific course of conduct for federal employees to follow." Id. at *7. Next, the district court held that the second prong of the two-part test was satisfied because the

government's "allocation of resources in the aftermath of Katrina not only includes the element of judgment or choice . . . but that element of choice is clearly one grounded in social, economic, and public policy." Id.

Finally, the district court denied plaintiffs' request for pre-dismissal discovery because "the fact-based discovery that [p]laintiffs are anxious to obtain only comes into play once they identify the specific directive that [d]efendants have ignored." Id. The court reasoned that discovery would not "assist [plaintiffs] in meeting this crucial threshold requirement" because any mandatory directive would necessarily be in the "public realm." Id. Thus, the district court dismissed the claims against the United States, its agencies, and federal officers in their official (but not individual) capacities, for lack of subject matter jurisdiction under Rule 12(b)(1). Id. at *8.[6]

Subsequently, the district court consolidated plaintiffs' 2007 complaints with the remainder of the 2006 complaints, which remained pending against individual defendants in their individual capacities. Director Brown then moved to dismiss the claims against him, and the government moved to dismiss the FTCA claims for the reasons specified in the district court's prior order of dismissal.

Plaintiffs undertook several actions in response. First, they sought to amend their complaints to allege that the United States instituted an "aid blockade" by intentionally refusing to send aid to the Convention Center and the Cloverleaf. Second, plaintiffs opposed both motions to dismiss by reasserting their opposition to dismissal on the grounds that the NRP created mandatory directives and that dismissal was premature because discovery was necessary to identify nondiscretionary duties. The district court held a hearing on the

---

[6] On an unopposed motion from the government, the district court substituted nunc pro tunc the United States for the federal agencies and individual defendants for all claims arising under the FTCA that were dismissed by the district court.

motions on October 3, 2007. The court granted plaintiffs' motions to amend. Thereafter, however, it granted Director Brown's and the government's motions to dismiss. In its brief order, the court adopted the reasons given in its order of April 30, 2007.[7] Plaintiffs filed a timely notice of appeal. They appeal only the district court's dismissal of their FTCA claims against the United States. We have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

A.   Discretionary Function Exception to the Stafford Act

We must determine whether the district court properly dismissed the case under Rule 12(b)(1) for lack of subject matter jurisdiction on the ground that the United States has not waived sovereign immunity for its decisions related to its provision of disaster relief services under the NRP. "We review a district court's dismissal for lack of subject matter jurisdiction de novo." Stiles v. GTE Sw., Inc., 128 F.3d 904, 906 (5th Cir. 1997). "In our de novo review . . ., we apply the same standard as does the district court . . . ." Wagstaff v. U.S. Dep't of Educ., 509 F.3d 661, 663 (5th Cir. 2007) (internal quotation marks and citation omitted). Under our traditional explication of the standard applied by the district court, the district court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases:  (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981). Here, the district court did not resolve any disputed facts, so we, as did the district court, "consider the allegations in the plaintiff[s'] complaint as true." Id. at 412. "[O]ur review is limited to determining whether the district court's application of the law is

---

[7] Plaintiffs at various times filed notices under Rule 41 of the Federal Rules of Civil Procedure dismissing from the lawsuit Secretary Chertoff, Secretary Rumsfield, and Secretary Leavitt, in their individual capacities, because they had not been served and had not been subject to either of the court's orders of dismissal.

correct" and, to the extent its "decision [was] based on undisputed facts, whether those facts are indeed undisputed." Id. at 413. We then ask if dismissal was appropriate. See Gaubert, 499 U.S. at 327 ("'accept[ing] all of the factual allegations in [the plaintiff's] complaint as true' and ask[ing] whether the allegations state a claim sufficient to survive a motion to dismiss" (quoting Berkovitz, 486 U.S. at 540)).

"Plaintiff[s] bear[] the burden of showing Congress's unequivocal waiver of sovereign immunity." St. Tammany Parish v. Fed. Emergency Mgmt. Agency, No. 08-30070, slip op. at 11–12 (5th Cir. Jan. 22, 2009). "At the pleading stage, plaintiff[s] must invoke the court's jurisdiction by alleging a claim that is facially outside of the discretionary function exception." Id. at 12 & n.3 (citing Gaubert, 499 U.S. at 324–25).

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983); see also Williamson v. U.S. Dep't of Agric., 815 F.2d 368, 373 (5th Cir. 1987) ("The doctrine of sovereign immunity is inherent in our constitutional structure and . . . renders the United States [and] its departments . . . immune from suit except as the United States has consented to be sued."). Because "[s]overeign immunity is jurisdictional in nature," F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994), Congress's "waiver of [it] must be unequivocally expressed in statutory text and will not be implied," Lane v. Pena, 518 U.S. 187, 192 (1996) (internal citation omitted); see also Petterway v. Veterans Admin. Hosp., 495 F.2d 1223, 1225 n.3 (5th Cir. 1974) ("It is well settled . . . that a waiver of sovereign immunity must be specific and explicit and cannot be implied by construction of an ambiguous statute.").

Plaintiffs have alleged claims under the FTCA for failure to provide due care in the provision of emergency aid pursuant to the NRP. The FTCA authorizes suits against the United States for damages arising from:

injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Thus, the FTCA waives sovereign immunity and permits suits against the United States sounding in state tort for money damages. In re Supreme Beef Processors, Inc., 468 F.3d 248, 252 (5th Cir. 2006). As long as state tort law creates the relevant duty, the FTCA permits suit for violations of federal statutes and regulations. See Johnson v. Sawyer, 47 F.3d 716, 728 (5th Cir. 1995) (en banc) ("If the requisite relationship and duty exist, then the statutory or regulatory violation may constitute or be evidence of negligence in the performance of that state law duty.").[8] The FTCA, however, excepts discretionary functions and duties from this waiver of sovereign immunity. See 28 U.S.C. § 2680(a). The FTCA's "discretionary function exception" provides that the waiver of sovereign immunity in § 1346(b) does not apply to:

Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Id. The "discretionary function exception is thus a form of retained sovereign immunity." In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir. 2008).[9]

---

[8] Because plaintiffs appeal the district court's grant of defendant's motion to dismiss for lack of subject matter jurisdiction, we need not consider the merits of whether their claims give rise to tort liability under Louisiana law.

[9] It "'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" Berkovitz, 486 U.S. at 536 (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984)). It is intended to "assure protection for the Government against tort liability for errors in administration or in the exercise of discretionary functions." Dalehite v. United States, 346 U.S. 15, 26–27 (1953)

The government promulgated the NRP under authority granted, in part, by the Stafford Act. "Although the Stafford Act does not contain a waiver of sovereign immunity, it does contain a discretionary function exception to governmental liability nearly identical to the one contained in the FTCA." St. Tammany Parish, No. 08-30070, slip op. at 16 (internal citation omitted) (citing Graham v. Fed. Emergency Mgmt. Agency, 149 F.3d 997, 1001 (9th Cir. 1998)). The Stafford Act's discretionary function exception provides that the United States will not be liable for:

> any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions of this chapter.

42 U.S.C. § 5148. "The Stafford Act's discretionary function exception exists, despite the lack of an express waiver of sovereign immunity, to protect the government from liability for claims based on its discretionary conduct brought pursuant to the FTCA, [the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq.], or other statutes of general applicability." St. Tammany Parish, No. 08-30070, slip op. at 16–17. "Nonetheless, this provision 'preclude[s] judicial review of all disaster relief claims based upon the discretionary actions of federal employees.'" Id. at 17 (citing Rosas v. Brock, 826 F.2d 1004, 1008 (11th Cir. 1987)).

The parties begin by disputing the meaning of the Stafford Act's discretionary function exception as it applies to the claims alleged in this case. In a companion case in which we addressed the same issue, we held that "'discretionary function or duty' has the same meaning in § 5148 as its does in § 2680(a)." St. Tammany Parish, No. 08-30070, slip op. at 19. We reached this conclusion after reviewing the nearly identical texts of the two provisions and

---

(citation omitted).

the legislative history of the Stafford Act and after rejecting the government's counterarguments—which were the same arguments that the government maintains in this case. See id. at 17–25; accord In re World Trade Ctr. Disaster Site Litig., 521 F.3d at 188–89 (holding that the FTCA's and Stafford Act's discretionary function exceptions "employ practically identical language: both provide protection for the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a [F]ederal agency or an employee of the [Federal] Government." (internal quotation marks and citations omitted, alterations in original)). Thus, we may rely on precedent interpreting the phrase "discretionary function or duty" under the FTCA's discretionary function exception to provide meaning to the Stafford Act's discretionary function exception in this case. See St. Tammany Parish, No. 08-30070, slip op. at 25.[10]

B.     Duties under the NRP

We now determine the applicability of § 5148 of the Stafford Act to this case by turning to the well-established precedent defining discretionary conduct under § 2680(a) of the FTCA. The Supreme Court has developed a two-part test for determining whether the federal government's conduct qualifies as a discretionary function or duty under this exception. See Gaubert, 499 U.S. at 322–23 (citing Berkovitz, 486 U.S. at 536–37).

First, the conduct must be a "matter of choice for the acting employee." Berkovitz, 486 U.S. at 536. "The exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'"

---

[10] The FTCA's and Stafford Act's discretionary function provisions are not identical. For example, § 2680(a) expressly precludes review "whether or not the discretion involved be abused," while § 5148 contains no such express provision. Here, however, we need not decide the import of this difference in statutory language because plaintiffs have not argued that government agencies or agents abused their discretion; instead, they have argued that they lacked discretion.

Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536) (alteration in original). Thus, "'it is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." Id. (quoting Varig Airlines, 467 U.S. at 813). If a statute, regulation, or policy leaves it to a federal agency or employee to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary. See id. at 329. On the other hand, "[t]he requirement of judgment or choice is not satisfied" and the discretionary function exception does not apply "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" Id. at 322 (quoting Berkovitz, 486 U.S. at 536).

Second, "even 'assuming the challenged conduct involves an element of judgment,'" we must still decide that the "'judgment is of the kind that the discretionary function exception was designed to shield.'" Id. at 322–23 (quoting Berkovitz, 486 U.S. at 536); see also Varig Airlines, 467 U.S. at 813. "Because the purpose of the exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537). With this understanding, however, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." Id. at 324. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 325.

In this case, plaintiffs argue that the government failed to perform or was negligent in its performance of the specific duties prescribed by the NRP—namely, the provision of food, water, shelter, medical assistance, and transport to the Convention Center and to the Cloverleaf. (See Pls.' Br. 34 ("The Convention Center and Cloverleaf certainly fall into the categories of places where the federal government had an express duty to provide the support that meant the difference between life and death for these three Plaintiffs.")); see also Gaubert, 499 U.S. at 324 ("[A]n agency may rely on internal guidelines rather than on published regulations."). The NRP directives that plaintiffs cite permit agents to exercise judgment or choice that is subject to policy analysis. We therefore hold that the government's conduct under the NRP—even its failure to provide food, water, shelter, medical assistance, and transport to the Convention Center and to the Cloverleaf—qualifies under the Stafford Act's discretionary function exception.

Under the first prong of the Berkovitz test, plaintiffs fail to identify any specific, nondiscretionary function or duty that does not involve an element of judgment or choice. To the contrary, plaintiffs cite a large number of NRP provisions that contain generalized, precatory, or aspirational language that is too general to prescribe a specific course of action for an agency or employee to follow.

Plaintiffs first allege that Secretary Chertoff failed to comply with the NRP Base Plan's requirement that within 120 days of the NRP's issuance he identify and establish procedures for the rapid deployment of appropriate assets. See Dep't of Homeland Sec., Nat'l Response Plan, at ix. According to plaintiffs, Secretary Chertoff completed this duty on September 6, 2005, beyond the 120-day window and after the events in this case.[11] We conclude that, despite the

---

[11] It is somewhat unclear whether plaintiffs allege Secretary Chertoff's failure to promulgate procedures pursuant to the NRP-CIS or failure to develop the NRP-CIS itself.

18

delay, this agency time line created no judicially enforceable duty on the part of Secretary Chertoff. Cf. Action on Smoking & Health (ASH) v. Dep't of Labor, 100 F.3d 991, 993–94 (D.C. Cir. 1996) (treating more formalized statutory and regulatory deadlines as nonmandatory, aspirational goals that do not circumscribe the discretion of the agency to delay formation of policy in good faith).

Plaintiffs next cite numerous provisions of the Annex as prescribing specific action. These provisions can be grouped into two categories: (1) plan context, and (2) agency responsibilities. Neither category gave rise to a nondiscretionary duty. With respect to the Annex's context, the "Situation" section noted that in devastating natural disasters, "[m]edical support is required not only at medical facilities, but at casualty evacuation points, evacuee and refugee points and shelters, and at other locations to support field operations." Dep't of Homeland Sec., Nat'l Response Plan, at CAT-2. The ostensibly mandatory language "is required," when read in light of the broad goals of the Annex—which "establishe[d] the context and overarching strategy"—did nothing more than explain the needs that arise in an emergency. Satisfaction of those needs was a broad, implied goal allowing for significant choice in its implementation by federal agencies. This broad goal, therefore, satisfies the first prong of the discretionary function test. See Shansky v. United States, 164 F.3d 688, 691 (1st Cir. 1999) (A "broadly worded expression of a general policy goal contained in the [agency's] operating manual . . . suggests that the [agency] and its functionaries will have to make discretionary judgments about how to apply concretely the aspirational goal embedded in the statement."); Tippett v. United States, 108 F.3d 1194, 1197 (10th Cir. 1997) ("[T]he general goal of protecting human life in the nation's national parks is not the kind of specific mandatory directive that operated to divest [the federal agent] of discretion in the situation he faced."); Valdez v. United States, 56 F.3d

1177, 1180 (9th Cir. 1995) ("While the said policy guidelines certainly outline general policy goals regarding visitor safety, the means by which [agency] employees meet these goals necessarily involves an exercise of discretion."); Autery v. United States, 992 F.2d 1523, 1529 (11th Cir. 1993) ("Such a general guideline is insufficient to deprive the federal government of the protection of the discretionary function exception." (internal quotation marks and citations omitted)). We reach the same conclusion for other contextual provisions that plaintiffs cite, such as those contained in the Annex's "Planning Assumptions" and "Concept of Operations" sections.[12]

Plaintiffs also identify "responsibilities" that the Annex allocated to specific agencies. For example, once the NRP processes are implemented, the Annex tasks DHS with, e.g., activating and deploying resources in accordance with the NRP-CIS; identifying and operationalizing facilities to support the deployment of federal resources; and maintaining communications to ensure a common understanding of resource requirements. Dep't of Homeland Sec., Nat'l Response Plan, at CAT-5. We conclude that these (and similar) responsibilities were so general that they too fail to prescribe a nondiscretionary course of action. Almost by definition these "responsibilities" required the agency to exercise judgment and choice to define specific directives or functions.

---

[12] The planning assumption that "Federal support must be provided in a timely manner to save lives" was expressly an assumption, not a specific directive, and was modified by a sentence suggesting the exercise of judgment on the part of agency officials: "This may require mobilizing and deploying assets before they are requested via normal NRP protocols." Dep't of Homeland Sec., Nat'l Response Plan, at CAT-3. The same conclusion applies to the "guiding principle" that "[n]otification and full coordination with States occur, but the coordination process should not delay or impede the rapid mobilization and deployment of critical Federal resources," and the description that the federal government should ensure that "[i]ncident-specific resources and capabilities (e.g., medical teams, search and rescue teams, equipment, transportable shelters, preventive and therapeutic pharmaceutical caches, etc.) are activated and prepare for deployment to a Federal mobilization center or staging area near the incident site." Id. at CAT-4. These provisions did not direct specific action from federal agencies or employees and certainly did not require the provision of resources to the Convention Center and the Cloverleaf, as necessary for subject matter jurisdiction in this case.

"Statements made at this level of generality do not satisfy Gaubert's and Berkovitz's specific prescription requirement. Were the law otherwise, the discretionary function exception would be a dead letter." Shansky, 164 F.3d at 691; see also Rosebush v. United States, 119 F.3d 438, 442 (6th Cir. 1997) ("The relevant inquiry is whether the controlling statutes, regulations and administrative policies mandated that the [agency engage in relevant conduct] in any specific manner." (internal citation omitted, emphasis in original)); Ochran v. United States, 117 F.3d 495, 500–01 (11th Cir. 1997) ("[T]he use of the word 'shall' in describing the responsibilities of the AUSA does not necessarily mean that the Guidelines left no room for the AUSA to exercise judgment or choice. . . . [T]he provisions . . . leave room for responsible officials to exercise choice or judgment in discharging their responsibilities." (internal citations omitted)). Simply put, these responsibilities required judgment and choice to make them applicable to specific situations.

Aside from the provisions of the NRP, plaintiffs offer cursory argument that mission assignments gave rise to nondiscretionary directives satisfying the first prong of the Berkovitz test and that an aid blockade also gave rise to the federal government's liability. Plaintiffs' assertions are misplaced. We initially note that plaintiffs did not present argument related to the mission assignments to the district court. We typically will not entertain legal arguments or evidence presented for the first time on appeal; however, because mission assignments were mentioned in passing in the record, we will dispose of plaintiffs' argument here. The issuance of mission assignments is left to the discretion of FEMA. See 44 C.F.R. § 206.5. Mission assignments are often nonspecific, requiring an agency to exercise additional judgment or choice regarding, e.g., where and how to complete the requested mission. The evidence cited by plaintiffs does not support the existence of a specific mission assignment (let alone sub-tasks), for which an employee had no lawful option but to adhere, that ordered the

21

provision of assistance to evacuees at the Convention Center or the Cloverleaf prior to decedents' deaths.[13]

Regarding the aid blockade, plaintiffs allege in their amended complaint that the federal government prevented the American Red Cross from accessing the Convention Center and the Cloverleaf from August 30 to September 2, 2005. Assuming the truth of these allegations, as we must, plaintiffs fail to explain what nondiscretionary duty the federal government violated. Overall, the federal government's functions and duties under the NRP satisfy the first prong of the two-part test because they permit the exercise of judgment and choice.[14]

Under the second prong of the Berkovitz test, we hold that the government's decisions about when, where, and how to allocate limited resources within the exigencies of an emergency are the types of decisions that the discretionary function exception was designed to shelter from suit. Although

---

[13] In their brief, plaintiffs rely on mission assignments issued to Department of Defense ("DOD") and Department of Transportation ("DOT"); however, taken in the light most favorable to plaintiffs, the record evidence reveals that these mission assignments did not give rise to a specific directive that would have benefitted decedents. The August 30, 2005 mission assignment to DOD mentioned by Director Brown related to airlifting FEMA officials to the Superdome, and, to the extent it might have been applied more broadly, DOD officials would have had to exercise judgment regarding where, how, when, and how frequently to conduct the airlifts. It did not specifically mandate airlifts to the Convention Center or the Cloverleaf. Similarly, the August 31, 2005 mission assignment to DOT mentioned by Director Brown related to the delivery of 500 buses for general use in evacuations (which again was not a specific directive).

[14] For the first time in their reply brief and as part of their argument that the government owed a duty in tort, plaintiffs assert a "special relationship" that gave rise to an affirmative duty to protect where the federal government's negligence in designing or building the flood control system imposed a limitation on decedents' freedom to act on their own behalf and thus resulted in a "state-created danger." (See Pls.' Reply Br. 14–18.) Because they raise this argument only in their reply brief, we will not address it. We only note that, among the many other reasons to reject plaintiffs' assertion, the government is likely immune from such suits under the Flood Control Act of 1938, 33 U.S.C. § 702c ("No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."); and, whatever the viability of the state-created danger theory of liability in this circuit, their argument is meritless by reference to plaintiffs' own theory of the case (see Pls.' Br. 14 ("At the outset, it must be noted this is not a 'flood' case, but one concerning events which took place after the city of New Orleans flooded . . . .")).

plaintiffs contend that complying with the NRP was not policy-related,[15] they formulate no legal argument or factual development to support their conclusion. In light of the "strong presumption" that, where permitted by the relevant statute or regulation, the exercise of choice or judgment implicates relevant policy, see Gaubert, 499 U.S. at 324, decisions regarding the feasibility, safety, and benefit of mobilizing federal resources in the aftermath of a national disaster are grounded in social, economic, and public policy, see, e.g., Dep't of Homeland Sec., Nat'l Response Plan, at 6 (documenting policy considerations in the deployment of federal resources). As such, these decisions are clearly "susceptible to policy analysis," even if specific decisions were not the result of such a reasoned analysis. See Gaubert, 499 U.S. at 325; Shanksy, 164 F.3d at 688. Thus, we hold that the Stafford Act's discretionary function exception precludes subject matter jurisdiction in this case because the NRP and other

---

[15] Plaintiffs rely on Downs v. United States, 522 F.2d 990 (6th Cir. 1975), to contend that the NRP gave rise to no choice or judgment; however, their argument is better interpreted as arguing that choices and judgments under the NRP are not the kind that the Stafford Act's discretionary function exception was designed to protect. In 1975, without the benefit of the guidance provided by Berkovitz and Gaubert, the Sixth Circuit in Downs considered a situation in which an FBI agent dealing with a hijacked airplane and hostages chose a confrontational approach instead of a "waiting game" approach. Id. at 1002. The court of appeals concluded that the decision was contrary to the FBI Handbook, which emphasized "hostage safety and pilot cooperation." Id. The court held that "the FBI agents were not involved in formulating governmental policy" because that policy "had previously been promulgated in the FBI Handbook and in a memorandum jointly issued by the Departments of Transportation and Justice." Id. at 997. Without more information about the relevant provisions of the FBI Handbook, Downs has little functional value to our present analysis, and more importantly, we discount its conclusion, which distinguished between operational and planning negligence, in the aftermath of Gaubert's express rejection of that dichotomy. Gaubert held that:

> A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level.

499 U.S. at 325.

authorities leave policy-related choices or judgments to the discretion of the involved federal agencies.

C.    Entitlement to Discovery

The last question is whether the district court should have allowed plaintiffs to engage in limited discovery before dismissing the 2007 complaints so that plaintiffs could attempt to identify jurisdiction-establishing functions or duties not immunized from suit under the discretionary function exception. The district court held that "the fact-based discovery that Plaintiffs are anxious to obtain only comes into play once they identify the specific directive that [d]efendants have ignored. Such a directive will be in the public realm and therefore fact discovery will not assist them in meeting this crucial threshold requirement." Freeman, 2007 WL 1296206, at *7. We review the district court's evidentiary rulings for abuse of discretion. Andrade v. Chojnacki, 338 F.3d 448, 454 (5th Cir. 2003); Williamson v. U.S. Dep't of Agric., 815 F.2d at 382 ("It hardly bears repeating that control of discovery is committed to the sound discretion of the trial court and its discovery rulings will be reversed only where they are arbitrary or clearly unreasonable."); Mayo v. Tri-Bell Indus., Inc., 787 F.2d 1007, 1012 (5th Cir. 1986) (same). We find no abuse of discretion in this case.

The party seeking discovery bears the burden of showing its necessity. See Sec. & Exch. Comm'n v. Spence & Green Chem. Co., 612 F.2d 896, 901 (5th Cir. 1980) (holding that in the context of a summary judgment motion, the party seeking discovery "must conclusively justify his entitlement . . . by specifically demonstrating 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing'" and "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts" (internal citations omitted)). The party seeking discovery typically meets this burden by alleging the "specific facts crucial to immunity

which demonstrate[] a need for discovery." Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 852 (5th Cir. 2000). On the other hand, a party is not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion. See Williamson v. U.S. Dep't of Agric., 815 F.2d at 382. This is particularly true where the party seeking discovery is attempting to disprove the applicability of an immunity-derived bar to suit because immunity is intended to shield the defendant from the burdens of defending the suit, including the burdens of discovery. See Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 534 (5th Cir. 1992) (observing the "tension between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery"); cf. Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987) ("One of the purposes of the [Harlow v. Fitzgerald, 457 U.S. 800, 817 (1982),] qualified immunity standard is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'"); Williamson v. U.S. Dep't of Agric., 815 F.2d at 382–83 (affirming stay of discovery where absolute and qualified immunity applied).

Here, we find no fault in the district court's conclusion that a mandatory directive, if one existed, could be found in the public realm. Plaintiffs have not presented any argument addressing the district court's conclusion. While we need not decide whether the sources of a nondiscretionary federal directive, for the purposes of the discretionary function exception, will always be in the public domain, we conclude that in this case plaintiffs' allegations are based on statutes, regulations, and other authorities that are publicly available.[16] Despite

---

[16] This is particularly true here, where plaintiffs have relied on numerous congressional investigations regarding the government's response to Hurricane Katrina. See generally, e.g., H.R. Rep. No. 109-377; S. Rep. No. 109-322.

the district court's holding, plaintiffs have failed to articulate a discrete discovery request that might cure the jurisdictional deficiency and have failed to otherwise specify where they might discover the necessary factual predicate for subject matter jurisdiction; thus, we have no choice but to affirm. See, e.g., Gager v. United States, 149 F.3d 918, 922 (9th Cir. 1998) (affirming denial of discovery because plaintiffs "have not specified in any way where such additional evidentiary material might be found"); Arriba Ltd., 962 F.2d at 534 (permitting discovery only "circumspectly and only to verify allegations of specific facts crucial to an immunity determination").

Even if we assume that some relevant jurisdictional fact may not be available outside of discovery, plaintiffs have not made the requisite showing entitling them to such discovery. In their brief to this court, plaintiffs asseverate that discovery would reveal whether governmental mistakes were the result of an exercise of discretion or operational negligence, of delays in answering mission assignments, of nonchalance in pre-positioning supplies and personnel, of failing to provide adequate medical supplies, or of blockading the American Red Cross from evacuation points. This amorphous discovery request—which is at least more detailed than the general request asked of the district court to permit discovery to "flesh out" specifics of negligence—fails to assert the existence of a particular federal regulation, order, or directive (or the potential contents of any such authority) that is not already known in this case and that falls outside of the discretionary function exception. Nor do plaintiffs suggest how discovery might lead to such a directive; thus, the district court did not abuse its discretion when it denied this broad request for discovery. See Mesa v. United States, 123 F.3d 1435, 1439 (11th Cir. 1997) (holding that appellants failed to "point[] to any requested discovery that could reasonably be expected to reveal" conduct outside of the discretionary function exception); see also In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 365 (3d Cir. 2001)

(affirming stay of discovery pending dispositive motion where proposed discovery was for claims within the FTCA's discretionary function exception); Creek Nation Indian Hous. Auth. v. United States, 905 F.2d 312, 313 (10th Cir. 1990) (affirming denial of discovery before plaintiff could ascertain a violation of a nondiscretionary duty where the plaintiff failed to identify any applicable nondiscretionary regulation); Miller v. United States, 710 F.2d 656, 666 (10th Cir. 1983) (affirming denial of discovery where "there are no facts which plaintiffs could arguably develop to escape the effect of the statutes and regulations," which were "within the discretionary function exception").

The district court's conclusion is particularly sound in light of the reasons for which the Stafford Act's discretionary function exception confers immunity from suit. Congress intended the discretionary function exception to shelter the government from the burdens of answering a lawsuit—including those related to intrusive discovery—not just from potential monetary liability. See Rosas, 826 F.2d at 1008 ("[T]he legislative history of the statute reveals that Congress was concerned not only about the possible costs of paying damages, but also the certain costs of defending suits arising from government relief."). Without a more discrete, tailored request, we find no abuse of discretion and will not subject the executive branch to discovery in a case over which the district court lacks jurisdiction. See Gaubert, 499 U.S. at 324–25 ("For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.").

## III. CONCLUSION

The tragedies that gave rise to this litigation were compounded by the well-documented inability of all levels of government to provide timely relief to the hurricane's victims. The federal government has publicly admitted that it made many mistakes; however, even if those mistakes caused decedents' deaths,

which we are presently in no position to determine, the federal government's negligence does not give rise to tort liability absent the United States's express waiver of sovereign immunity. For the above explained reasons, we conclude that the United States has not waived sovereign immunity for the discretionary functions alleged in this case and therefore AFFIRM the district court's dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).